UNITED STATES of America,
Plaintiff-Appellant,

v.

Paul Vernon CASE, Gilbert Steele Sagaser and Frances Delores Sagaser,
Defendants-Appellees.

No. 18207.

United States Court of Appeals,
Seventh Circuit.

Nov. 25, 1970.

David J. Cannon, U. S. Atty., Steven C. Underwood, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellant.

L. William Staudenmaier, William M. Coffey, Milwaukee, Wis., for defendants-appellees.

Before SWYGERT, Chief Judge, DUFFY, Senior Circuit Judge, and KERNER, Circuit Judge.

KERNER, Circuit Judge.

The district court pursuant to a pre-trial hearing, granted a motion made by defendants-appellees, Paul Case, Gilbert Sagaser and Frances Sagaser, under Rule 41(e) of the Federal Rules of Criminal Procedure, and suppressed the admission of counterfeit currency, plates and equipment. The judge found that the warrantless arrest, search and seizure by Secret Service agents violated the defendants' rights under the Fourth Amendment; that the forcible entry by the agents into defendant Case's store without being refused admittance by the defendants violated 18 U.S.C. § 3109; and that the overhearing of conversations between the defendants by agents stationed in a hallway adjacent to the store violated the rules enunciated in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). We affirm.

Secret Service agents suspected that defendants, Paul Case and Gilbert and Frances Sagaser, were involved in the manufacturing of counterfeit money, and that they were operating out of Case's printing store located in a Milwaukee building complex. On June 14, 1969, agents were stationed in a hallway in the complex which they had entered by use of a key obtained from the landlord of the building complex. The hallway was connected to Case's store as well as a drugstore, restaurant and a

poodle shop. The district court found that the hallway was used by "a very confined group" and was not open to the general public. It was generally locked, and the proprietors were the only ones with keys.

The agents stationed in the hallway heard the sound of a printing press coming from Case's store. They also heard a female voice say: "How do you put on the seals and serial numbers?" and a male voice say, "There's two hundred thousand down, one hundred thousand to go." A male voice asked, "Can they hear you in the drugstore?"; another replied that there was nothing to worry about. These statements were relayed to agents stationed outside the complex through a radio transmitter placed in the hallway. At 8:45 p. m., one of the agents overheard a voice say, "I am leaving now. I want to be there before it gets dark."

Moments later, Case walked into the hallway and was arrested and searched. Two other agents went to the door of the store and noticed Gilbert and Frances Sagaser begin to walk briskly to the rear of the store. One of them yelled, "Federal agents, you're under arrest," breaking through the glass in the door and apprehending the Sagasers. An agent observed a printing press with a plate bearing the impression of currency.

On the basis of these arrests and the search of Case's store, the three defendants were indicted for possession of currency equipment, and Case and Sagaser for manufacturing United States currency. Before the trial, the district court suppressed the use of the currency, plates and equipment as evidence. The government appeals this ruling.

 The surreptitious listening to the conversations in Case's store by the agents stationed in the hallway was an invasion of the defendants' right to privacy, guaranteed by the Fourth Amendment. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The defendants sought to keep their discussion private, and did not expect that federal agents would be located just a few feet away in the hall. As this court said in United States v. Haden, 397 F.2d 460 (7th Cir. 1968): "One who intends a conversation or transaction to be private and takes reasonable steps to keep it private is protected from government intrusion * * *." The trial judge found and we agree that:

This is not a careless babbling on the street corner. Part of the overheard language * * * was to the effect that they were concerned that someone might be hearing in the drugstore. And they also evidenced their concern by changing locks. The fact that their conduct may have been designed to protect evil operations is immaterial as far as their right to privacy is concerned in the Constitutionally protected quarters. They did nothing, it seems to me, to expose themselves to the uninvited ear.

The government claims, however, that the defendants do not have a right to privacy in conversations conducted in a tone of voice audible to someone situated next to, but outside of, the store. For this proposition, it cites United States v. Llanes, 398 F.2d 880 (2d Cir. 1968), which allowed admission of conversations overheard by an agent stationed in the hallway of an apartment building outside of the defendant's apartment. The court explained that "* * * conversations carried on in a tone quite audible to a person standing outside the home are conversations knowingly exposed to the public."

Llanes, however, is based upon the finding that the hallway was a public place and that the defendants could hardly expect conversations audible to someone in a public place to be regarded as private. On the contrary, the district judge in this case found that the hallway "* * * was not such a public area as to entitle the Court to consider it a non-protected area" and we concur. See e. g., United States v. Watkins, 369 F.2d 170, 171 (7th Cir. 1966). The

hallway was kept locked. The lock to one of the doorways had been changed by defendant Case. The hallway was used by a very confined group, and, most of the time, limited to the proprietors of the stores in the building.

Since the evidence gathered as a result of the overhearing by the agents in the hallway violated the Fourth Amendment, it cannot be used to sustain a finding of probable cause upon which to justify the subsequent arrests and searches. Therefore, the arrest of Case and the Sagasers was unlawful. It follows that the subsequent warrantless searches incident to the invalid arrests are likewise unlawful. United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L. Ed. 59 (1951); McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L. Ed. 153 (1948); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L. Ed. 436 (1948). As Mr. Justice Jackson explained in his concurring opinion in *McDonald*: "Having forced an entry without either a search warrant or an arrest warrant to justify it, the felonious character of * * * [the officers'] * * * entry, it seems to me, followed every step of their journey inside * * * and tainted its fruits with illegality. * * *" 335 U.S. at 459, 69 S.Ct. at 195.

Even if the agents' investigation did not invade the privacy of the defendants under the Fourth Amendment, we believe the better practice by the agents would have been to obtain arrest and search warrants.

As the Court in *Katz* explained:

It is apparent that the agents in this case acted with restraint. Yet the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer. They were not required, before commencing the search, to present their estimate of probable cause for detached scrutiny by a neutral magistrate. They were not compelled, during the conduct of the search itself, to observe precise limits established in advance by a specific court order. Nor were they directed, after the search had been completed, to notify the authorizing magistrate in detail of all that had been seized. In the absence of such safeguards, this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end. Searches conducted without warrants have been held unlawful "notwithstanding facts unquestionably showing probable cause," Agnello v. United States, 269 U.S. 20, 33, 46 S. Ct. 4, 6, 70 L.Ed. 145, for the Constitution requires "that the deliberate, impartial judgment of a judicial officer * * * be interposed between the citizen and the police * * *." Wong Sun v. United States, 371 U.S. 471, 481–482, 83 S.Ct. 407, 9 L.Ed.2d 441. "Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes," United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions. 389 U.S. at 356, 357, 88 S.Ct. at 514 [footnotes omitted].

The investigation in this case had been conducted for over a year and utilized many agents, both for surveillance and the arrests and the searches on June 14. There was a sufficient amount of time available to procure an arrest and search warrant.

The exigencies of the circumstances did not excuse the agents from securing a warrant. There is no evidence which would support the finding that any of the defendants were fleeing the scene or that there was a danger that the plates, currency or equipment was to be destroyed. Further, the agents had sufficient time to secure a warrant, and

there were judicial officers available to make a determination of probable cause.

The government also argues that the district court erred in concluding that the entry by the two agents into Case's store violated 18 U.S.C. § 3109, which allows a Secret Service agent to break open any window "* * * of a house * * * to execute a search warrant if after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself. * * *"[1] The same criteria apply to searches without warrants. Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1967).

■ The district court correctly found that the agents did not give the defendants, Gilbert and Frances Sagaser, an opportunity to open the door or refuse to admit them. The agents entered immediately after identifying themselves. Further, there was nothing to indicate that the agents were forced to liberate themselves from any danger. Even though a gun was later found in the store, the agents were unaware of its presence at the time of their entry. Also, there were no other exigent circumstances present to excuse compliance with § 3109. Although there was a back exit, agents were stationed there and the Sagasers could not have escaped from the store.

Affirmed.

DUFFY, Senior Circuit Judge (dissenting).

I respectfully dissent. This is an appeal from an order of the District Court granting defendants' motion for the suppression as evidence of approximately $700,000 of counterfeit currency, together with counterfeit plates and equipment, all of which was seized at the time of their arrest on June 14, 1969, at a store which had been rented by defendant Case and which was located on North 46th Street, Milwaukee.

On June 9, Case was observed using a parking lot adjacent to the store which he had rented. The landlord informed the Government agents that Case had rented the store and that a printing press had been delivered to the store.

Adjacent to the store was an L-shaped hallway. People customarily using this hallway included restaurant patrons and deliverymen. The adjoining druggist used this hallway as a storage area.

On June 14, 1969, Government agents were stationed in this hallway. They entered same by the use of a key which the landlord of the building had provided.

The agents heard the printing press in operation in the store which had been rented by Case. They heard a female voice ask "How do you put on the seals and serial numbers?" They also heard a male voice which said "There is $200,000 down and $100,000 to go." Thus the agents, standing in the hallway, became aware that a federal crime of large proportions was being committed in their presence. There is no question but that the overheard conversations would have constituted probable cause for an arrest or search warrant, if the agents were properly stationed in the hallway.

The majority opinion states that the agents had no right to be in the hallway adjoining Case's store. It relies heavily on Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), which involved the Government's use of statements obtained by means of electronic eavesdropping of a telephone booth. I disagree with the majority's position because I believe that the hallway was public in character to the extent that conversations overheard in it were non-protected.

The physical structure of the building in which the store rented by defendant Case was located was such that a person standing next to the door could hear

1. Although § 3109 literally applies only to "houses," it, like the Fourth Amendment itself which refers to houses, has been held to include commercial establish-ments. Silverthorne Lumber Company v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); United States v. Mullin, 329 F.2d 295 (4th Cir. 1964).

conversations carried on in the front room. The fact that printing presses were running in turning out $700,000 of counterfeit money would, very likely, cause the parties in the room to speak in a louder tone of voice than would normally be the case.

Under such circumstances, it is well to remember the statement of Justice Stewart in *Katz* that "What a person knowingly exposes to the public, even in his own home or office, is not a subject to Fourth Amendment protection." (389 U.S. at 351, 88 S.Ct. at 511).

The inner hallway was not a part of the premises leased by Case. In addition to previously mentioned users of the hallway, the heating and air-conditioning units for the drug store were suspended from the ceiling of the hallway. Several persons other than the defendant Case had keys to the hallway. Also, persons making use of the toilet facilities in the basement of the building would use the stairway from the hall leading to the basement.

The fact that an inner hallway like this is shared to some degree by tenants and by the public is important when dealing with Fourth Amendment claims. As was stated by the Court in Marullo v. United States (5 Cir., 1964), 328 F.2d 361, 363 which dealt with the degree of privacy a motel occupant might expect "* * * But a transient occupant of a motel must share corridors, sidewalks, yards and trees with other occupants. Granted that a tenant has standing to protect the room he occupies, there is nevertheless an element of public or shared property in motel surroundings that is entirely lacking in the enjoyment of one's home."

I find the hallway in the commercial establishment involved in the present case just as public in character as the motel in *Marullo* and certainly as much of a common hallway as that involved in United States v. Llanes, 398 F.2d 880 (2 Cir., 1968).

As I understand the additional points in the opinion of the majority, the Government agents who had legally gained access to the hallway to arrest the Sagasers are said to have violated 18 U.S.C. § 3109 because of a fatal flaw in timing their access to the room. According to the majority, the agents, after announcing their office and that the occupants of the rooms were under arrest, should have, in addition, announced the magic words "Let us in" and then paused an indeterminate number of seconds before forcing their way in. Perhaps this might be so in a normal case with a normal door. But here, the glass in the door enabled the officers to see clearly the direction the defendants Sagasers were taking. As the agent was pronouncing the arrest, he noted that the Sagasers had turned from the door and had started toward the rear of the room "briskly." They were headed toward the adjoining room where the printing press, plates and $700,000 worth of counterfeit money were located. To quibble over a few seconds under these circumstances seems absurd to me.

It is abundantly clear that probable cause existed for the arrest of the defendants. The fact that a warrant was not obtained does not seem constitutionally fatal to me. The dissenting opinion of Mr. Justice White stated in Chimel v. California, 395 U.S. 752, 779, 89 S.Ct. 2034, 2048, 23 L.Ed.2d 685 "* * * And this Court has regularly affirmed the validity of warrantless arrests without any indication whatever that there was time to get a warrant, and indeed where all circumstances pointed to the opposite conclusion. * * *" See also Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726. In my judgment, the order of the trial court suppressing the evidence should be reversed.