**UNITED STATES of America,**
**Appellee,**

v.

**Richard WILKES, Appellant.**

**No. 285, Docket 34827.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 11, 1971.

Decided Nov. 26, 1971.

John C. Sabetta, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., and John W. Nields, Jr., Asst. U. S. Atty., of counsel), for appellee.

Donald Nawi, New York City (Julian W. Friedman, New York City, of counsel), for appellant.

Before FRIENDLY, Chief Judge, FEINBERG, Circuit Judge, and DAVIS, Associate Judge *.

FRIENDLY, Chief Judge:

Richard Wilkes was convicted in November, 1968, of violating 21 U.S.C. §§ 173 and 174 after a bench trial in*the District Court for the Southern District of New York. His appeal[1] challenges the denial of a suppression motion and the decision at trial. Both branches of the appeal rest on a common core of evidence, although testimony at the suppression hearing concerning facts furnished by the informers could not properly be, and presumably was not, considered by the judge at the trial.

■ In mid-July 1967 two informants advised federal narcotic agents that Wilkes and one Katherine Kelly were selling heroin in the vicinity of 46th St. and Broadway, New York City, and also in Wilkes' apartment on the left side of the first floor of a brownstone multi-apartment dwelling at 128 West 78th Street. One of the informants, whose name was disclosed and who had previously given "reliable" information leading to two arrests, told the agents that the method pursued was that Kelly would carry the narcotics on her person after receiving them from Wilkes. On a number of occasions the agents observed the pair together, entering or leaving the apartment and also in the vicinity of 46th St. and Broadway. On the afternoon of July 28, the named informant phoned the agent she was going into Manhattan to visit Wilkes and Kelly that evening. About 10 P.M. she phoned Agent Rossi that Wilkes and Kelly were in the W. 78th St. apartment and that drugs were present.[2] Agents Rossi and

---

* Of the United States Court of Claims, sitting by designation.

1. The long delay in bringing on this appeal, during which Wilkes has been serving his sentence, was caused by the failure of retained counsel to notify Wilkes that he was not prosecuting the appeal. The episode demonstrates the necessity for procedures like those adopted by this court some time ago under the leadership of Chief Judge Lumbard, and now directed for all circuits by a resolution of the Judicial Conference of the United States passed on October 29, 1971, for the court's seeing to it that criminal appeals, regardless of whether counsel has been assigned or retained, shall be processed with all reasonable speed. Once counsel was assigned for Wilkes, the instant appeal was prosecuted with diligence and presented with skill.

2. Although at the trial Agent Rossi could not recall whether the informant had disclosed the basis of her knowledge, Agent Pallatroni testified at the suppression hearing that she had visited Wilkes and Kelly as planned and had seen narcotics present. Since Pallatroni could have gotten this information only from Rossi, his testimony was equivalent to telling what Rossi had told him, and, if the rules of evidence apply, would have been inadmissible to show what the informant had said. Admission at a suppression hearing of declarations of an informer to a law enforcement officer generally involves no breach of the hearsay rule since the issue is what the officer reasonably believed, not whether the information was true. United States v. Li Fat Tong, 152 F.2d 650, 652 (2 Cir. 1945); United States v. Miguel, 340 F.2d 812, 814 n. 1 (2 Cir.), cert. denied, 382 U.S. 859, 86 S.Ct. 116, 15 L.Ed.2d 97 (1965). Cf. Brinegar v. United States, 338 U.S. 160, 172–176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Pallatroni's testimony as to what Rossi had told him about the informer's call might well be admissible on this basis, since it would show what *he* reasonably believed; whether the hearsay rule would permit its reception also to show what Rossi believed at the time is much more doubtful. See Proposed Federal Rules of Evidence 803(3). However, we note also that the proposed Federal Rules of Evidence provide that, except with respect to privilege, the rules shall be inapplicable in "the determination of questions of fact preliminary to the admissibility of evidence when the issue is to be determined by the judge. . . ." language surely broad enough to include suppression hearings. Rule 1101(d). In any event it was Wilkes' attorney who brought out Pallatroni's testimony.

Pallatroni went to the vicinity of 128 W. 78th St. and parked their cars across the street. At 10:15 P.M. they observed two women, having swollen hands and wearing long-sleeve sweaters despite the warmth of a July night, and consequently believed by the agents to be narcotics addicts, enter No. 128, approach the door to what had been described as Wilkes' apartment, and then disappear from view. The agents entered the unlocked building, walked along a common vestibule, and positioned themselves outside the apartment door.

Pallatroni heard some profanity and what he described as a male voice shouting "I don't sell bundles at a discount." Shortly the apartment door opened, disclosing the two girls, Kelly and Wilkes. The agents put Kelly and Wilkes under arrest. Agent Rossi searched the purses and sweater pockets of the two girls with negative results. He took Kelly into the back part of the apartment and told her he would search the whole apartment [3] unless she would turn over narcotics to him. She surrendered 138 glassine envelopes which had been packaged into five and a half "bundles" [4] containing 138 glassine envelopes of heroin, which had been concealed in her pants. A search of Wilkes, who, the agents testified, was in his underwear, revealed nothing. He sought permission to retrieve money in the pocket of a suit hanging in a padlocked closet, and pointed to trousers which he said contained the closet key. They did, as well as keys to two locks on the apartment door.

The only additional evidence of any significance presented by the Government at the trial consisted of an offer by Wilkes to Pallatroni after arrival at the Bureau of Narcotics office to pay $2,000 if Pallatroni "would eliminate his involvement in the case," and a request by Wilkes that Rossi accept $525 in cash

from the money he had in his possession. Wilkes denied that he lived at the apartment and claimed his sister's address as his residence. He attributed his presence at the apartment on the evening of his arrest to a desire to repay money to the tenant, John Martin, who, along with Wilkes, was organizing a bus trip to Rockland State Park. He claimed that Kelly was a friend of Martin's; said he had been casually acquainted with her earlier in his life and had recently seen her only at the apartment and but once or twice; denied speaking to the young women except for a casual greeting; insisted he had been fully dressed; denied that any of the keys fit the closet or door locks; and also denied offering money to Pallatroni and Rossi. The superintendent of 128 W. 78th St. testified that a John Martin paid the rent on the apartment, and another witness said that he had bought two tickets for the bus ride from each of Martin and Wilkes. Martin was not called.

■■ It will be convenient to deal first with the contentions relating to the conviction. The most important of these is the Government's alleged failure to show Wilkes' constructive possession of the narcotics ultimately removed from Kelly's pants [5] and thus create the premise for the inference, permitted by the statute, of knowledge of illegal importation. Wilkes relies heavily on the statement in United States v. Febre, 425 F. 2d 107, 111 (2 Cir.), cert. denied, 400 U.S. 849, 91 S.Ct. 40, 27 L.Ed.2d 87 (1970), that since our decision in United States v. Jones, 308 F.2d 26, 31 (2 Cir. 1962) (en banc), we have upheld findings of constructive possession only when the evidence showed at least one of the three indicia mentioned in *Jones*, to wit, "that a given defendant set the price for a batch of narcotics, had the final say as to means of transfer, or was

---

3. Assuming the legality of the arrest, this would have been proper under the rule then prevailing. Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971).

4. There was testimony that in the usage of the narcotics trade a "bundle" consists of 25 double-wrapped glassine bags.

5. Kelly, who was tried along with Wilkes, did not appeal her conviction.

able to assure delivery. * * *" The Government answers, and we agree, that the remark overheard by Agent Pallatroni, if properly attributed to Wilkes, alone constituted sufficient evidence of the first factor and that it along with other circumstances afforded a sufficient basis for inferring the other two. Appellant's counsel asks us to rule that the remark was improperly admitted in the absence of proof of Pallatroni's expertness in identification of the sex elements in the human voice, although no objection was made at trial. Even in this age of specialization most people are confident of their ability generally to identify the sex of an unseen adult by hearing the voice; indeed, with today's habits of hair and dress, there may be instances when determination of sex by voice is more reliable than by casual observation of appearance. It is true there is a chance of mistake—some females have very low pitched voices and some males extremely high ones—but the law does not insist on the impossibility of error as a condition to testimonial competence. See 2 Wigmore, Evidence § 658 at 768 (3d ed. 1940). While in most cases mere testimony that an utterance was by a male voice would have relatively little probative value, here Wilkes was the only male in the room.[6]

■ The overheard remark also went a long way toward establishing probable cause for arrest. Indeed, when we add the agents' observation of the entrance of two young women reasonably believed to be addicts, there was little that required supplementation by the informer's tip. More than enough was furnished if Pallatroni's version of the call to Rossi was properly considered, see fn. 2; there was still enough if it was not. See United States v. Manning, 448 F.2d 992 (2 Cir. 1971), (en banc).

Affirmed.

6. Wilkes' contention that use of the remark violated the Fourth Amendment is foreclosed by decisions of this court. United States v. Miguel, 340 F.2d 812 (2 Cir.), cert. denied, 382 U.S. 859, 86 S.Ct. 116 (1965); United States v. Conti, 361 F.2d 153, 156-157 (2 Cir. 1966), vacated on other grounds, 390 U.S. 204, 88 S.Ct. 899, 19 L.Ed.2d 1035 (1968); and United States v. Soyka, 394 F.2d 443, 450 fn. 2, see id. at 452 (2 Cir. 1968), cert. denied, 393 U.S. 1095, 89 S.Ct. 883, 21 L.Ed.2d 785 (1969), establish that the agents had properly stationed themselves in public space near the door, so as to be in a position to arrest the addicts or others when they emerged. Their overhearing Wilkes may well have been an unexpected bonus, analogous to the "plain view" doctrine. See Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). Moreover, even if there was evidence that the agents' purpose was to overhear conversations in voices loud enough to be audible to the human ear in a public place outside the apartment, we have held that no Fourth Amendment violation would occur. United States v. Llanes, 398 F.2d 880, 883-884 (2 Cir. 1968), cert. denied, 393 U.S. 1032, 89 S.Ct. 647, 21 L.Ed.2d 576 (1969).