276 So.2d 291 (1973)
STATE of Louisiana
v.
Nick C. Di BARTOLO.
No. 52419.
Supreme Court of Louisiana.
March 26, 1973.
Rehearing Denied May 7, 1973.
*292 George M. Leppert, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Harry H. Howard, Asst. Atty. Gen., Jim Garrison, Dist. Atty., Louise Korns, Asst. Dist. Atty., for plaintiff-appellee.
BARHAM, Justice.
The defendant, Di Bartolo, having waived trial by jury, was convicted upon his trial by the judge of possession of heroin, a violation under R.S. 40:962, as amended by Acts 1951, No. 30, § 1, and was sentenced to five years' imprisonment in Louisiana State Penitentiary. He has appealed and reserved nine bills of exceptions to rulings of the trial court. Bill of Exceptions No. 1 and Nos. 4 through 9 were not briefed by the appellant and are therefore deemed abandoned. See State v. Edwards, 261 La. 1014, 261 So.2d 649 (1972), and cases cited therein.
In Bill of Exceptions No. 2, reserved when the trial court overruled defense counsel's motion to suppress the evidence, the defendant contends that the heroin and narcotics paraphernalia seized from him were obtained as a result of a constitutionally impermissible search and seizure. We agree that the search and seizure were illegal, and we therefore reverse the defendant's conviction and sentence. No other bills of exceptions need be discussed.
The pertinent facts are as follows: On the afternoon of April 29, 1970, at approximately 3:00 p. m., two New Orleans police officers, Officers Varnado and De Long, were patrolling along Baronne Street when they observed several men, whom they recognized *293 to be narcotics addicts, standing in a driveway talking to a woman in the second-story window of an apartment house located at 2106 Baronne Street. After some discussion between them, the officers and the men left the apartment building location.
Upon returning to the address about 10 minutes later, the officers observed the defendant, whom they had never seen before, leaning out of the same window and noticed that he "ducked" out of sight upon observing the police car. The officers "felt strongly" that narcotics were being dealt from the upstairs window and decided to investigate the apartment building, feeling that "* * * we had no time to get a search warrant * * * ".[1] The officers parked their car on the other side of the block, jumped the fence, and tried to gain admittance at the door of the building. Finding the door locked and receiving no response to their knock, the officers walked to the side of the building and discovered a large window with steps below it. The glass window was open, but there was a screen in place on the window, which the officers swung out or pulled out in order to gain admittance. The officers stepped into the first-floor hallway, walked up the stairs to the second floor, and there saw, through the open door of Apartment 8, the woman whom they had earlier observed at the window now seated on a bed counting money. The officers talked to the woman, and, during the course of this discussion, the defendant stepped out of Apartment 7 and was observed to be carrying narcotics paraphernalia in his right hand. The policemen thereupon arrested the defendant, took him back into Apartment 7, searched his person, and recovered 44 glassine envelopes containing heroin from his pocket.
In his per curiam to Bill of Exceptions No. 2 the trial judge held: "The Court felt that the police had a right to conduct a surveillance of the premises in order to obtain the application for a search warrant and while doing so the defendant was seen in possession of a narcotic outfit and arrested in a public hallway in a building." (Emphasis supplied.)
While the officers could use the public ways to conduct a surveillance of the premises, we cannot agree that they had a right to conduct a surveillance on the premises in the manner in which they did. There did not exist circumstances which would supply probable cause to arrest anyone or probable cause to conduct a search without a warrant in the locked building. It was not until the officers' encounter with the defendant in the second-floor hallway after their illegal entry that any probable cause appeared.
It is axiomatic that an arrest made without a warrant and without probable cause is invalid. Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). See State v. Wood, 262 La. 259, 263 So.2d 28 (1972), and C.Cr.P. Art. 213. The quantum of information which constitutes probable cause must be measured by the facts of the particular case. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). A court, in determining probable cause, takes into account the total atmosphere of the case. United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). We cannot conceive, in the case sub judice, that probable cause existed merely because the police officers suspected that narcotics were being dealt with in the apartment building.
It is equally well established that a search conducted without a warrant and *294 without probable cause is invalid, even though a valid warrantless search may be made incident to a lawful arrest. Here we are not dealing with a search made pursuant to a lawful arrest or a warrantless search made on the basis of probable cause. The officers' action in illegally entering the locked apartment building clearly taints their subsequent observations and actions within the building and renders the arrest illegal and the evidence seized incident thereto inadmissible in the defendant's prosecution.
In McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), Justice Jackson in his concurring opinion stated:[2] "* * * Having forced an entry without either a search warrant or an arrest warrant to justify it, the felonious character of their entry, it seems to me, followed every step of their journey inside the house and tainted its fruits with illegality. * * *" We believe that this is the proper view to be taken in this case.
We reject the arguments that the defendant's arrest in the hallway adjoining the apartment where he was a guest was effected in a public area in which the defendant had no reasonable expectation of privacy, and that the officers' observation of narcotics paraphernalia in the defendant's hand, in "plain view", rendered the arrest of the defendant legal and the subsequent search incident to a lawful arrest. It is well settled that reliance on the "plain view" doctrine must depend on the officer's right to be in the location from which the view is obtained. United States v. McKlemurry, 461 F.2d 651 (5th Cir.1972); United States v. Davis, 423 F.2d 974 (5th Cir. 1970), and cases cited therein. In this case it is abundantly clear that the officers involved had no such right. The fact that the location where the arrest took place was a hallway, not an integral part of the apartment which the defendant was visiting, does not vitiate the defendant's right to reasonably expect privacy from government intrusion. Cf. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The hallway was adjacent to the apartment involved, and the testimony adduced at the hearing on the motion to suppress reveals that a tenant or guest would have to enter the hallway to gain access to the bathroom facilities which served the second-floor apartments. This fact appears to somewhat diminish the public nature of the hallway in which the arrest occurred. Furthermore, apparently the building was kept locked and only tenants who had keys and guests whom they admitted could gain entrance to the building.[3]
It is thus clear that the defendant's arrest and conviction were secured by means which violated his rights under the Fourth Amendment of the United States Constitution and that the conviction, so obtained, may not stand.[4]
Accordingly, the conviction and sentence are hereby reversed.
HAMLIN, C. J., dissents.
SANDERS, C. J., dissents with written reasons.
SUMMERS, J., dissents for the reasons assigned by the Chief Justice.
*295 SANDERS, Chief Justice (dissenting).
The defendant, Di Bartolo, was charged with the possession of heroin in violation of LSA-R.S. 40:962 (1948). Having waived trial by jury, his case was heard by the trial judge, who found him guilty. The judge sentenced him to a term of five years in Louisiana State Penitentiary. The defendant has appealed, relying mainly upon Bill of Exceptions No. 2 (denial of the motion to suppress the heroin). The majority, in my opinion, erroneously holds that there was an unconstitutional search and seizure, requiring reversal of the conviction.
The defendant reserved Bill of Exceptions No. 2 to the overruling of his motion to suppress the heroin used as evidence. Defendant contends that the heroin was secured in a search and seizure contravening the Fourth Amendment of the United States Constitution.
The facts shown by the record are these. While cruising on Baronne Street in New Orleans, Police Officers DeLong and Varnado saw a woman leaning out of a second story apartment house window at 2106 Baronne, talking to four men. The officers recognized the men as narcotic users. On numerous occasions, they had seen people in the window. Shortly thereafter, the officers passed the house again. They saw Di Bartolo leaning out of the same window. When he saw the police car he "ducked" out of sight. The officers "felt strongly" that narcotics were being sold from the upstairs window. Intending to secure information about the location and numbers of the apartments for search warrant purposes, they left the car and approached the building. The front door was locked, and no one responded to their knock. They then walked to the side of the building and found a large window with steps beneath it. It had apparently been used as a door. The glass window was open. Looking inside, the officers saw a hallway with steps leading to the second floor of the apartment house, where they had seen the activity. They pushed the loose screen aside, entered, and walked up to the second floor. At the end of the hallway, they saw an open door through which they caught sight of Lilly Mae Dillon, the woman they had seen in the window. She was seated on a bed counting money. They inquired about the source of the money. While the officers were talking to her from the hall, Di Bartolo came out of an adjacent apartment, carrying a narcotics outfit in his right hand in plain view. The officers immediately placed him under arrest for possession of narcotics. They took him back into the apartment from which he emerged, searched his clothing, and found 44 glassine envelopes of heroin in his pocket.
The defendant was not a tenant in the apartment house, but testified vaguely that he was visiting a girl friend there.
In overruling the motion to suppress, the trial judge held:
"The Court felt that the police had a right to conduct a surveillance of the premises in order to obtain the application for a search warrant and while doing so the defendant was seen in possession of a narcotic outfit and arrested in a public hallway in a building."
*296 I agree with the trial judge. When the defendant entered the hall, the officers saw that he had narcotics paraphernalia in his hand.[1] This observation, especially when considered with the surrounding circumstances, gave the officers probable cause to arrest him for the possession of narcotics.[2] The search of his person was incident to that arrest.
As early as 1914, the United States Supreme Court recognized the right of law enforcement officers to search the person arrested. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652. Such a right arises from the necessity of protecting the arresting officers, preventing the escape of the prisoner, and safeguarding the implements of the crime, contraband, or tangible evidence. The arrest-search may be a surviving incident of the ancient hue and cry in Anglo-Saxon Law. People v. Chiagles, 237 N.Y. 193, 142 N.E. 583, 32 A.L.R. 676 (1923).
This constitutional doctrine has been codified in Article 225 of the Louisiana Code of Criminal Procedure which provides: "A peace officer making an arrest shall take from the person arrested all weapons and incriminating articles which he may have about his person."
In this court, the defendant argues, however, that the entry and presence of the officers in the apartment building was unlawful and infects all of their official actions in the building with unconstitutionality, including the arrest-search. The majority agrees with this contention. However, I conclude ultimately that it must fail.
Assuming, without deciding, that defendant had a reasonable expectation of privacy within the apartment that he was allegedly visiting, the same expectation does not extend to the hallways used by the tenants and public alike. In the hall of the apartment building, there could be no reasonable expectation on his part of freedom from governmental intrusion. See Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); Combs v. United States, 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed.2d 308 (1972).
The Fourth Amendment was designed primarily to protect the privacy of one's home or office against arbitrary governmental invasion. Under sound constitutional theory, it does not extend to the hallways of hotels, motels, or apartment houses. See United States v. St. Clair, D.C.N.Y., 240 F.Supp. 338 (1965); United States v. Buchner, D.C., 164 F.Supp. 836 (1958), cert. den., 359 U.S. 908, 79 S.Ct. 584, 3 L.Ed.2d 573; United States v. Perkins, D.C., 286 F.Supp. 259 (1968); Marullo v. United States, 5th Cir., 328 F.2d 361 (1964); State v. Buchwald, 293 Minn. 74, 196 N.W.2d 445 (1972). Compare United States v. Blank, D.C., 251 F.Supp. 166 (1966).
In United States v. St. Clair, supra, the officers entered the hallway of an apartment house through subterfuge, after being denied entry by the landlord. A later arrest-search of defendant's apartment resulted in the seizure of narcotics. The court denied the motion to suppress, correctly stating:
"[T]he Court... holds that the means used to gain entrance to the common hallway on which defendant's apartment fronted did not violate his Fourth Amendment right. The hallway, used by tenants and the public alike, was not part of the defendant's apartment. The fact that the door leading to it from the street was locked for the security of the tenants did not make the hallway part of the defendant's dwelling so that his constitutional privilege under the Fourth Amendment extended thereto. To hold otherwise would extend the protection under the Fourth Amendment beyond its *297 purpose. Its essential aim is to protect the right of privacy in one's home and effects against arbitrary and unlawful invasion. Only unreasonable search and seizure is condemned; reasonable search is not. In urban centersand most of the nation today is urbanizedthe multifamily dwelling is the mode of life. Apartments in some structures number in the hundreds. It is not uncommonindeed it is usualthat in some dwellings the entrance doors from the street to the common corridors leading to the apartments are locked for security reasons and entry is gained either by a key possessed by the apartment occupant, or by a buzzer system whereby one notifies the occupant who, if he desires to admit the caller, responds by releasing the locked door. In this circumstance, to hold that the common corridors, public hallways, landings and stairwells may be considered part of the tenant's home and that his right of privacy under the Fourth Amendment extends to such areas, would raise unreasonable barriers to law enforcement. To require, as a condition of a lawful and reasonable search of an apartment, the consent of a tenant or a landlord to admission to the public areas which give access to the apartment would mean that enforcement officers, having probable cause to arrest, whether with or without a warrant, would in many instances necessarily alert a suspect, thereby affording him ample opportunity to flee or to destroy the fruits or instruments of the crime or contraband. No test of reasonableness under the Fourth Amendment decisions requires that any such doctrine be applied." (Footnotes omitted.)
In United States v. Miguel, 340 F.2d 812, cert. den. 382 U.S. 859, 86 S.Ct. 116, 15 L.Ed.2d 97 (1956), the United States Second Circuit Court of Appeal refused to suppress narcotics on the theory that the seizing officers were improperly in an apartment house lobby, stating:
"We have been cited no authority which would include the lobby of a multi-tenanted apartment house within the `curtilage' of each tenant. Such authority as there is points the other way."
See also United States v. Price, 345 F.2d 256 at f. n. 3, cert. den., 382 U.S. 949, 86 S.Ct. 404, 15 L.Ed.2d 357 (1965).
In this case, the presence of the officers in the apartment house hallway violated no right of privacy of the defendant. While there, the officers saw the defendant emerge from one of the apartments, holding narcotics paraphernalia. They arrested him lawfully, and the arrest-search of his clothing produced a quantity of heroin. The search violated no constitutional safeguards. Hence, the trial judge properly denied the motion to suppress the heroin.[3]
For the reasons assigned, I respectfully dissent.
NOTES
[1] Officer Varnado subsequently testified, at the hearing on the motion to suppress, that their purpose in investigating the building was to "* * * see what the lay of the land was".
[2] In McDonald, the officers illegally entered the building where the defendant lived by breaking into the landlady's bedroom via a window.
[3] The fact that the defendant was a guest and not a tenant does not affect his right to challenge the legality of the officers' actions since any person legitimately on premises where a search occurs has a right to challenge the validity of the search. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).
[4] The writer of this opinion notes ex proprio motu that the bill of information uses the words which customarily preface most chargesthat is, "did wilfully and unlawfully', but fails to charge that the defendant intentionally or knowingly possessed a narcotic drug. We have held repeatedly under former R.S. 40:962 that knowledge is an essential element of the crime of possession of a narcotic drug. The present penal provision for possession, R.S. 40:966, requires knowledge as an ingredient of the crime. Since we have found merit in Bill of Exceptions No. 2, and since the defendant did not object to the form of the information, the majority pretermits the question of the validity of the information in this case. However, two cases docketed on our March-April calendar raise the question of whether an indictment which fails to charge that the accused knowingly and intentionally possessed narcotics is sufficient to sustain a conviction. See No. 52827, State v. George "Scottie" Scott, and No. 53070, State v. McArthur Davis. It would be well for the State as well as the defendant to note the court's determination in those cases.
[1] The officers described the narcotics outfit as the "cooker and the works," referring also in their testimony to the needle.
[2] The officers also arrested Lilly Mae Dillon.
[3] Although the adequacy of the bill of information was not raised by the defendant, I have given the matter my attention. The crime is charged under the 1948 Narcotics statute. The Bill of Information recites that the defendant "did wilfully and unlawfully possess ... a narcotic drug, to-wit: heroin". The bill of information is adequate under the holding of State of Peltier, 229 La. 745, 86 So.2d 693 (1956).