**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Leland CARRIGER, Defendant-Appellant.**

**No. 74–1901.**

United States Court of Appeals, Sixth Circuit.

Argued April 9, 1976.

Decided Aug. 25, 1976.

Wilfred C. Rice, Detroit, Mich., for defendant-appellant.

Frederick S. Van Tiem, U. S. Atty., Richard L. Delonis, Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellee.

Before McCREE and LIVELY, Circuit Judges, and ALLEN,* District Judge.

McCREE, Circuit Judge.

■ This is a direct appeal from a jury conviction upon three counts of an indictment charging violations of the Drug Abuse Prevention and Control Act. 21 U.S.C. § 841(a)(1). The dispositive issue is whether the entry by a government agent, without a search or arrest warrant, into a locked apartment building violated appellant's Fourth Amendment rights. After gaining entry through a locked entrance as workmen were leaving the twelve unit apartment building, of which appellant was a tenant, a federal officer went to the third floor via a stairway and observed what he believed to be an exchange of drugs occurring at the door of one of the apartments. We hold that because the officer did not have probable cause to arrest appellant or his accomplice before he invaded an area where appellant had a legitimate expectation of privacy, the subsequent arrest and seizure of narcotics were invalid.

The relevant facts are as follows. In November and December of 1972 and the early part of January, 1973, agents of the Bureau of Narcotics and Dangerous Drugs were conducting an investigation of Charles Beasley. Undercover agents purchased heroin from Beasley on several occasions. The purpose of the purchases and investigation was to identify Beasley's source. In mid-December, Carriger also became a subject of investigation, but there is no indication in the record that Carriger, at that time, was believed to be Beasley's source.

On January 18, 1973, the day of appellant's arrest, a meeting was held in the Detroit offices of the Bureau of Narcotics and Dangerous Drugs. As the agent-in-charge of the operation testified at the suppression hearing, the purpose of the day's activities was to order a "sufficiently large quantity of heroin from defendant Beasley to force him to go, under agents' surveillance, to his source of supply. And I believed his source of supply to be either defendant Leland Carriger or his brother, Vernon Carriger, or both." When asked what led him to believe that the Carrigers were involved in drug trafficking, the agent testified that Beasley told an informant that he was purchasing narcotics "from two brothers over on the east side of Detroit." The agent also testified that, on some unspecified date before the January 18 raid, an informant accompanied Beasley to the apartment building in which Carriger lived and that Beasley returned with a quantity of narcotics. It is significant that no search warrant was obtained for Carriger's apartment and no arrest warrants were obtained for either Beasley or Carriger before the plan was implemented. It is also significant that the agent-in-charge conceded that before the day of the raid the Government did not have probable cause to arrest Carriger for violation of any narcotics laws. In fact, it did not appear that the agents knew that Carriger was in town before the raid since it was shown that Carriger spent a substantial amount of time in Minnesota and that he had just returned to Detroit from Minnesota on the day before the raid.

* The Honorable Charles M. Allen, United States District Judge, Western District of Kentucky, sitting by designation.

As the first step in the execution of the agents' plan, an informant contacted Beasley by telephone shortly before 10:10 on the morning of January 18. The informant was told in the telephone conversation that Beasley "had to go to a source to get the heroin." Agents stationed at Beasley's home watched him leave in his car at approximately 10:10. Surveillance agents traced Beasley to the apartment building at 6106 McClellan. which Carriger owned and where he maintained an apartment. Agent Turner was stationed at the apartment building and observed Beasley carrying an empty green shopping bag as he approached the entrance door to the apartment building. Before Beasley arrived at the building, Turner had unsuccessfully tried to gain entry to the building. He discovered that both front and back entrance doors were locked and could only be opened by a key or by someone within activating a buzzer system. Turner attempted to enter the building when Beasley was admitted, but by the time Turner reached the door, it had closed and automatically locked. However, within a few minutes several workmen walked out through the door where Turner was standing, and, before the door closed again, Turner slipped into the building, without permission, and began to search for Beasley.

Unable to locate Beasley immediately, Turner used his portable radio to tell his superiors that he was in the building but had been unable to find Beasley. During the radio transmission, Turner saw Beasley walking down the third floor corridor, with the green bag under his arm. According to Turner, this time the bag appeared to have something in it.

Turner assumed Beasley also saw him making the radio transmission because Beasley started walking quickly down the staircase. A few moments later, Turner observed Beasley at the door of Apartment 303 conversing with Carriger and then saw Beasley give him the green bag. Thereupon both Carriger and Beasley began to walk away from the apartment. Turner then radioed the other officers, told them what had transpired, and went downstairs to open the door to admit them to the building. The officers proceeded directly to Apartment 303 where Turner had observed the suspected drug transaction. After giving notice of their identity and purpose, they forced entry. Neither Carriger nor Beasley was found in the apartment, but an officer saw a clear plastic bag containing a prescription envelope of the type that Beasley had used previously for packaging heroin that was sold to a government informant. The bag and envelope were found to contain heroin. Shortly after the agents broke into the apartment, Carriger returned and was placed under arrest. Beasley, who walked away from the building, was arrested by other agents as he approached his automobile. The shopping bag was discovered behind a carton on a stairwell near Carriger's apartment. The bag contained 89.5 grams of heroin. A search warrant was then obtained, and more heroin was found in two safes in the basement, one in a storage area reserved for all tenants, and one in a separate carpeted, paneled room under the stairway.

The district court suppressed evidence seized from the safe in the paneled room apparently because this location was not part of the open common areas of the building or storage area assigned to Apartment 303. The court determined that the agents should not have entered that room. However, the district judge refused to suppress either the plastic bag found in the apartment or the shopping bag found behind a carton on the stairwell. The district court held that the agent's entry into the building and his search for Beasley in the common areas of the building did not violate defendant's reasonable expectation of privacy. Accordingly, the court believed that no violation of Carriger's Fourth Amendment rights had occurred. The court reasoned that the agent who saw Beasley in the corridor carrying a bag that "contained something," and then observed Beasley transfer the bag to Carriger at the door leading to the latter's apartment, had probable cause to believe that Carriger was committing a felony. Accordingly, the

agents had authority to force entry into the apartment and to seize the plastic bag found in "plain view." The seizure of the shopping bag from behind the carton in the stairwell did not violate Carriger's Fourth Amendment rights because, like the agent's entry into the building's common areas, there could be no reasonable expectation of privacy in the building stairwell.

In refusing to suppress the evidence found in the apartment building, the district court relied upon *United States v. Wilkes*, 451 F.2d 938 (2nd Cir. 1971); *United States v. Conti*, 361 F.2d 153 (2nd Cir. 1966), *vacated on other grounds*, 390 U.S. 204, 88 S.Ct. 899, 19 L.Ed.2d 1035 (1968); *United States v. Miguel*, 340 F.2d 812 (2d Cir. 1965).

The Government relies upon the same cases on appeal and contends that they stand for the proposition that where an officer's entry into the common areas of an apartment building is peaceable, there is no infringement upon the tenant's Fourth Amendment rights.

In *Miguel*, the court held that the lobby of a high-rise apartment building where the officers arrested defendant was not within the defendant's curtilage. In that case the officers entered the lobby when the entrance door was opened by a woman leaving the building. In *Conti*, evidence constituting probable cause was obtained by keeping the apartment under surveillance from inside a hallway door. The apartment building had a hall door which was meant to be kept locked, but there was testimony that the door was often open, and even if closed, its lock was broken and could be opened by almost any key. The court held that the peaceable entry, although perhaps a technical trespass, did not vitiate the surveillance evidence tending to establish probable cause. *Wilkes*, the only one of these cases decided after *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), involved an unlocked building and surveillance outside an apartment door where the agents heard a male voice shouting, "I don't sell bundles at a discount." The court determined that the previous decisions in

*Conti* and *Miguel* foreclosed appellant's contention that such surveillance violated the Fourth Amendment.

Our Circuit has not yet considered the issue whether a tenant in an apartment building has a reasonable expectation of privacy in the common areas of the building not open to the general public. Although we believe that the Second Circuit's expressions on this issue should be considered, we believe they must be evaluated in light of *Katz* and in light of the particular circumstances of this case.

In *Katz*, the Court held that the Government's use of an electronic listening device that was attached to the outside of a public telephone booth and that was used by FBI agents to overhear and record statements made by petitioner violated the privacy upon which he justifiably relied while using the phone booth, and that this conduct violated the Fourth Amendment. The Court of Appeals for the Ninth Circuit had rejected the contention that the recordings had been obtained in violation of the Fourth Amendment because "[t]here was no physical entrance into the area occupied by [Katz]." 369 F.2d at 134. The Supreme Court abandoned the traditional "trespass" doctrine relied upon by the court of appeals and said: "The fact that the electronic device employed to achieve that end [recording Katz' words] did not happen to penetrate the wall of the booth can have no constitutional significance." 389 U.S. at 353, 88 S.Ct. at 512.

We believe that the Supreme Court's determination that the "trespass" doctrine could "no longer be regarded as controlling" was intended to expand the protection afforded by the Fourth Amendment. Certainly, that was the effect in *Katz* where the Court found an illegal search and seizure even though no trespass was committed by FBI agents. Accordingly, we are of the view that *Katz*, considered with the case law before it, should be read as holding that trespassing is one form of intrusion by the Government that may violate a person's reasonable expectation of privacy. Although we do not hold today that any evi-

dence gained as a result of a federal agent's trespass constitutes an illegal search and seizure, we believe it is helpful to rely on property concepts "simply because they assist in establishing the perimeters of the Fourth Amendment guarantees as they relate to the home." *Fixel v. Wainwright,* 492 F.2d 480, 483 n.3 (5th Cir. 1974).

We believe the case before us is different in degree but not in kind from *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). In that case police had kept McDonald under surveillance for two months because they suspected that he was operating an illegal lottery. While standing outside the rooming house in which he lived, the police thought they detected the sound of an adding machine. Since adding machines were often used in numbers games, the officers believed that a numbers operation was taking place inside one of the rooms. One of the officers proceeded, without a warrant, to open and climb through a window leading into the landlady's room. He identified himself to her and then admitted the other officers to the building. The officers proceeded to the second floor and one of them stood on a chair outside one of the rooms and looked through the transom. Upon viewing numbers slips and adding machines in the room, the officer yelled to McDonald to open the door, whereupon McDonald opened the door, was arrested, and the evidence of the crime was seized. The Court rejected the Government's contention that the conviction should be upheld. Justice Jackson entered a separate concurring opinion explaining why he thought the Court held the search invalid. He said:

Doubtless a tenant's quarters in a rooming or apartment house are legally as well as practically exposed to lawful approach by a good many persons without his consent or control. Had the police been admitted as guests of another tenant or had the approaches been thrown open by an obliging landlady or doorman, they would have been legally in the hallways. Like any other stranger, they could then spy or eavesdrop on others without being trespassers. If they peeped through the keyhole or climbed on a chair or on one another's shoulders to look through the transom, I should see no grounds on which the defendant could complain. If in this manner they, or any private citizen, saw a crime in the course of commission, an arrest would be permissible.

But it seems to me that each tenant of a building, while he has no right to exclude from the common hallways those who enter lawfully, does have a personal and constitutionally protected interest in the integrity and security of the entire building against unlawful breaking and entry. Here the police gained access to their peeking post by means that were not merely unauthorized but by means that were forbidden by law and denounced as criminal. In prying up the porch window and climbing into the landlady's bedroom, they were guilty of breaking and entering—a felony in law and a crime far more serious than the one they were engaged in suppressing. Having forced an entry without either a search warrant or an arrest warrant to justify it, the felonious character of their entry, it seems to me, followed every step of their journey inside the house and tainted its fruits with illegality. *Cf. Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652; *Taylor v. United States,* 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951; *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436.

335 U.S. at 458–59, 69 S.Ct. at 194–195.

We believe that what Justice Jackson said in *McDonald* applies here. The officer's entry into this locked apartment building without permission and without a warrant of any kind was an illegal entry and violated appellant's Fourth Amendment rights. Accordingly, the evidence obtained as a result of the unauthorized entry should have been suppressed.

■ We cannot agree with the district court that *McDonald* may be distinguished upon the basis that it proscribed a forcible entry into an apartment building while the

entry here was peaceable. Whether the officer entered forcibly through a landlady's window or by guile through a normally locked entrance door, there can be no difference in the tenant's subjective expectation of privacy, and no difference in the degree of privacy that the Fourth Amendment protects. A tenant expects other tenants and invited guests to enter in the common areas of the building, but he does not except trespassers.[1] *See, e. g., Piazolla v. Watkins,* 442 F.2d 284 (5th Cir. 1971), where the court indicated that although university students may have no justifiable expectation of privacy against an inspection of their rooms pursuant to university regulations, they do have a justifiable expectation of privacy against an intrusion made for the purpose of obtaining evidence in a criminal investigation. *See generally* Comment, *Katz and the Fourth Amendment,* 23 Cleveland State Law Review 63 (1974).[2]

The Fifth Circuit has recently considered whether a tenant has a reasonable expectation of privacy in a fenced backyard adjacent to his four-unit apartment building. *Fixel v. Wainwright,* 492 F.2d 480 (5th Cir. 1974). In that case two officers proceeded to petitioner's apartment building to execute a search warrant directed to petitioner's apartment. Upon arrival at the building one of the officers concealed himself at the rear while the other officer positioned himself at the front of the building. Over a 45 minute period five or six persons entered the building. Each time a visitor entered, Fixel walked to the backyard and removed a shaving kit from some rubbish located near a tree. He would then return to the apartment and shortly thereafter the visitor would leave through the front door. After the surveillance, one officer executed the search warrant in the apartment, but was unable to find any narcotics in the unit. In the meantime, the other officer went into the backyard to seize the shaving kit and discovered heroin in it. Judge Ingraham, speaking for the majority, said:

> Contemporary concepts of living such as multi-unit dwellings must not dilute Fixel's right to privacy any more than is absolutely required. We believe that the backyard area of Fixel's home is sufficiently removed and private in character that he could reasonably expect privacy. *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Thus, [the officer's] actual invasion into this protected area and search of the shaving kit violates the Fourth Amendment.

492 F.2d at 484 (footnote omitted). *See United States v. Case,* 435 F.2d 766 (7th Cir. 1970); *United States v. Rosenberg,* 416 F.2d 680 (7th Cir. 1969); and *State v. Di Bartolo,*

1. A Michigan statute provides:

750.115 **Same; or entering without breaking; buildings, tents, boats, railroad cars; entering public buildings when expressly denied**
Sec. 115. Any person who shall break and enter, or shall enter without breaking, any dwelling, house, tent, hotel, office, store, shop, warehouse, barn, granary, factory or other building, boat, ship, railroad car or structure used or kept for public or private use, or any private apartment therein, or any cottage, clubhouse, boat house, hunting or fishing lodge, garage or the out-buildings belonging thereto, or any other structure, whether occupied or unoccupied, without first obtaining permission to enter from the owner or occupant, agent, or person having immediate control thereof, shall be guilty of a misdemeanor: Provided, That this section shall not apply to entering without breaking, any place which at the time of such entry was open to the public, unless such entry has been expressly denied.

This section shall not apply in cases where the breaking and entering or entering without breaking were committed by a peace officer or some one under his direction in the lawful performance of his duties as such peace officer.

Since the building door was normally locked and could only be opened by a key or buzzer, the building was not open to the public, and the agent's entry into the building would amount to a criminal trespass under Michigan law.

2. The Supreme Court's recent decision in *United States v. Santana,* —— U.S. ——, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), held that a person who stands in a doorway leading to the vestibule of a house, is located in a "public place" for purposes of the Fourth Amendment. That decision does not hold that tenants in an apartment building or residents in other multi-family dwellings surrender their expectation of privacy in locked common areas of the building from which members of the general public are excluded.

276 So.2d 291, 13 Crim.Law Rptr. 2100 (1973) (Louisiana).

In *Case,* federal agents suspected defendants of counterfeiting money in a printing store. With the cooperation of the landlord, the agents stationed themselves in a hallway which connected with the defendant's premises, a drug store, a restaurant, and a poodle shop. The hallway was not open to the general public, was generally locked, and the proprietors were the only ones with keys. The agents heard, and through the use of a radio transmitter, communicated to other officers sounds and statements which were indicative of a counterfeiting operation. The court held that the activities of the agents violated the defendants' expectation of privacy and that evidence gained by the agents could not be used to establish probable cause for defendants' arrest. In *Rosenberg,* the court held that suppression of evidence obtained by law enforcement agents was necessary where, after entering a closed but unlocked entrance door to a business in a commercial building and looking into a lighted office, they found implicatory matters that formed an adequate basis to obtain a search warrant. In *Di Bartolo,* the Louisiana Supreme Court held that the observation of several known addicts standing in a driveway talking to a woman in a second story window of an apartment house, coupled with the observation ten minutes later of an unfamiliar person in the same window, did not give police officers probable cause to enter the locked building through a large window with steps below it and conduct further surveillance in the hallways. The illegality of the entry tainted everything discovered thereafter. The court said: "The fact that the location where the arrest took place was a hallway, not an integral part of the apartment which the defendant was visiting, does not vitiate the defendant's right to reasonably expect privacy from government intrusion." 276 So.2d at 294, 13 Crim.Law Rptr. at 2101.

These recent cases considered together with our understanding of *Katz* and *McDonald* suggest to us that when, as here, an officer enters a locked building, without authority or invitation, the evidence gained as a result of his presence in the common areas of the building must be suppressed.

As Justice Brandeis observed in his dissenting opinion in *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928):

> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution.

At oral argument, the Government asserted that even if the warrantless entry into the apartment building would otherwise constitute a violation of defendant's Fourth Amendment rights, nevertheless it was lawful because the officers had probable cause to believe that Beasley was committing a violation of federal narcotics laws. 21 U.S.C. § 878(3). Accordingly, it is argued, the entry into the apartment building was authorized to effect Beasley's arrest.

We are not persuaded by the Government's fallback argument. First, it seems doubtful that the officers had probable cause to believe that Beasley was making a purchase in the apartment building. Nothing Beasley said in the telephone conversation with one informant suggested that he was going immediately to pick up the heroin at the apartment house; nor was there more than suspicion that Carriger was the source. It was only the agents' speculation that a drug transaction was

taking place in the building. Although a warrantless arrest of a narcotics suspect is authorized by 21 U.S.C. § 878(3), such an arrest should be subjected to closer scrutiny than are arrests authorized by warrants issued after the exercise of the sound judgment of an impartial magistrate. *See United States v. Squella-Avendano,* 447 F.2d 575 (5th Cir.), *cert. denied,* 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971). *See also United States v. Watson,* 423 U.S. 411, 423, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *United States v. Davis,* 461 F.2d 1026 (3d Cir. 1972); *Dorman v. United States,* 140 U.S.App.D.C. 313, 435 F.2d 385 (1970).

█ We believe that the telephone conversation, the prior knowledge of the officers (that two brothers on the east side of Detroit were dealing in drugs, and that drugs had been picked up at the building once before), and the agents' observations of Beasley between the time he left his home and entered the building at 6106 McClellan were insufficient to afford the agents probable cause to believe that a drug transaction was taking place in the building.

However, assuming *arguendo* that the agents had probable cause to arrest Beasley, we believe that the Government's theory for upholding the arrest and initial search of Carriger's apartment must fail for the more fundamental reason that the agents cannot use the fact that there was probable cause to arrest Beasley as a pretext to effect the arrest of Carriger and to search his apartment.

In *United States v. Harris,* 321 F.2d 739 (6th Cir. 1963), we affirmed the district court's order of suppression in a case similar to this one. In that case, agents in the Bureau of Narcotics had reliable information that Harris was trafficking in narcotics. Nevertheless, without obtaining a search warrant, the agents proceeded to Harris' apartment, arrested him and searched the premises. Chief Judge Cecil, writing for the court, stated that: "An arrest may not be used as a pretext or subterfuge for making a search of premises without a search warrant where ordinarily one would be required under the Fourth Amendment." 321 F.2d at 741. In language that is equally applicable to this case, Judge Cecil explained:

> There was a strong urge on the agents to make a case against this defendant but we cannot permit the law to be circumvented by expediency.
>
> To give sanction to a search such as was made in this case, would virtually nullify the provision of the Fourth Amendment that, "The right of the people to be secure in their persons, houses, . . . against unreasonable searches and seizures, shall not be violated . .." 321 F.2d at 342.

Several other circuits have also condemned the tactic of circumventing the Fourth Amendment requirements by manipulating the time of a suspect's arrest to coincide with his presence in a place which government agents wish to search. *Amador-Gonzalez v. United States,* 391 F.2d 308 (5th Cir. 1968); *Taglavore v. United States,* 291 F.2d 262 (9th Cir. 1961); *McKnight v. United States,* 87 U.S.App.D.C. 151, 183 F.2d 977 (1950); *Blazak v. Eyman,* 339 F.Supp. 40 (D.Ariz.1971). *See also United States v. Lefkowitz,* 285 U.S. 452, 467, 52 S.Ct. 420, 76 L.Ed. 877 (1932).[3]

---

**3.** In *McKnight,* the court made a statement similar to the one contained in *Harris:*

> The police planned to and did reject a convenient present opportunity to make a lawful arrest in a public street and, without a search warrant or enough information to get one, broke into a house in order to seize evidence they hoped to find there. They found it and seized it. We think this is a plain violation of the prohibition in the Fourth Amendment of the Constitution against unreasonable searches and seizures. The government argues that what it aptly calls a "police strategem," waiting until McKnight was in a locked house before arresting him, justified the police in breaking into the house in order to arrest him and seize evidence. We think this is untenable.

183 F.2d at 978.

Here the officers could easily have effected Beasley's arrest as he left the building, if, at that moment, the agents had facts within their knowledge and of which they had reasonably trustworthy information sufficient to warrant a prudent man in believing that Beasley was in possession of narcotics. *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). But instead of accomplishing the arrest then, the Government now seeks to justify the entry into the apartment building, the search of Carriger's apartment, and his subsequent arrest in the building as incident to Beasley's arrest. If the purpose of the day's activities had been to arrest Beasley it would have been a simple matter for the officer to arrest Beasley when the officer saw him leaving the apartment building with the shopping bag that now contained "something." But it is clear from the record that the purpose of the day's activities was not to arrest Beasley but instead to discover who his source was.

Under the circumstances, we believe that the government agent violated the Fourth Amendment by entering the apartment building, and that entry was not legally permissible because probable cause did not exist for the arrest of Beasley. And, in any event, the Government may not use probable cause to arrest Beasley as a springboard to search an apartment and arrest another person whom the Government did not have grounds to believe was involved in narcotics transactions. Because the appellant could not have been convicted without the evidence obtained as a result of the unauthorized entry, it follows that the convictions must be reversed.

Reversed.