UNITED STATES of America,
Plaintiff-Appellee,

v.

Fernando FRANCIS,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Clara FRANCIS, Appellant,

and

Fernando Francis, Defendant-Appellant.

Nos. 79–5285, 79–5441.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 5, 1980.

Decided April 24, 1981.

Rehearing and Rehearing En Banc
Denied June 30, 1981.

Wilfred Rice, Detroit, Mich., Fernando Francis, pro se, for appellant and defendant-appellant.

James K. Robinson, U. S. Atty., Joseph E. Papelian, Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellee.

Before ENGEL, KEITH and KENNEDY, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

Defendant-appellant Fernando Francis appeals his conviction by a jury of possessing five grams of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). In addition, Francis and his mother, Clara Francis, appeal the District Court's ruling that neither established a claim to lawful possession of approximately $20,000 seized from a room in her home during a search by Drug Enforcement Administration (DEA) agents.

Defendant owned and operated "Poncho's Barbershop" on West McNichols in Detroit, Michigan. He received mail and occasionally spent a night at his mother's home on Klinger Street, also in Detroit. On September 29, 1978, DEA agents learned that within the preceding 24 hours an informant had observed heroin at Poncho's barbershop and at Mrs. Francis' home. Based on the informant's observations the agents obtained warrants to search both locations.

After the warrants were issued but before they were executed the agents, through further contact with the informant, learned that he/she had very recently purchased heroin from defendant at the shop. The agents concluded that this new information coupled with the informant's earlier observations gave them probable cause to arrest defendant before searching his shop. They placed the barbershop under surveillance on the evening of September 29. When defendant exited the agents followed and arrested him. They took him to a nearby parking lot where they searched him and interrogated him concerning drug activities. The search of defendant turned up two large rings of keys which included keys to the shop. The agents informed defendant when they arrested him that they had a search warrant for the barbershop.

The agents returned to the barbershop, both entrances of which were protected by an outer iron gate and an inner wooden door. They struggled with the keys for about five minutes in the presence of defendant before they successfully opened the iron gate at the front entrance. The District Court found that defendant gave them no assistance in effecting entry. The DEA agents had knowledge that some persons remained inside. Fearing that evidence of heroin trafficking was being destroyed, they did not further delay to find the key to the wooden inner door, but instead forced the door with a battering ram. At no time did they announce their purpose to the occupants or request their permission to enter.

The agents proceeded to search the barbershop. They discovered one small package of heroin in the public, haircutting portion of the shop, more heroin in the office of the shop, and assorted other items commonly used in the narcotics trade.

Upon completing the search of the barbershop the agents proceeded to the home on Klinger, again in the company of defendant. The agents stationed themselves at the front and side entrances to the home. The District Court found that the agents knocked but did not announce their authority or purpose, and battered the door down without giving the occupants an opportunity to respond. The agents searched the home and discovered a bedroom which contained more evidence of drug trafficking, several guns, and a safe. Inside the safe was approximately $20,000 in cash (the subject of the motion for return of property), drug paraphernalia, and several receipts addressed to the defendant at the Klinger home.

Defendant was indicted on November 17, 1978. An evidentiary hearing was held at which defendant challenged the admissibility of the evidence seized on the ground that the searches were illegally executed because the agents made unannounced, forcible entries of both buildings, and the evidence was the fruit of the illegal searches. Relying on the Supreme Court's opinion in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the District Court ruled *sua sponte* that defendant lacked standing to challenge the legality of the search at Klinger because he had no expectation of privacy in his mother's house. The District

Judge also sustained the search of the barbershop, finding that the circumstances justified the officers' failure to knock and announce their presence before executing a search warrant.

As the Government introduced its evidence at trial the judge was persuaded that defendant did have an expectation of privacy in one room of his mother's house, so had standing to challenge the search. At the close of the evidence he ruled that the agents' unjustified forcible entry invalidated the search of the Klinger premises. He excluded the evidence seized there, directing the jury to disregard all testimony relating to the items seized on Klinger.

The jury returned a guilty verdict. The defendant was sentenced to three years imprisonment plus a three-year special parole term. On appeal he raises issues as to the search of each premise, the sufficiency of the affidavit for the search warrants, the denial of a motion for mistrial, and the sufficiency of the evidence.

I. The Search of the Barbershop

Defendant contended before the trial court and argues again here that the search of the barbershop violated 18 U.S.C. § 3109 and therefore that the items seized there should have been suppressed. § 3109 provides that

> [An] officer may break open any outer or inner door or window of a *house*, or any part of a *house*, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of a warrant. (Emphasis added)

The Government, conceding noncompliance with § 3109, argues that it applies only to dwellings, and is thus inapplicable. Alternatively, it claims that exigent circumstances justified noncompliance, as the agents had word that the occupants knew of their presence and the agents had a reasonable belief that the occupants would destroy evidence. The Government also claims that because defendant, the owner of the shop, was informed that the agents had a search warrant and was present when they attempted to enter it notice of their authority and purpose would have been a useless gesture. Finally, the Government claims that because defendant was present while the agents were entering and the District Court found that he did not aid their entry, he has waived any protection that § 3109 offers.

The District Court held that § 3109 does not apply to the search of a business. However, it ruled that because § 3109 codifies "the common law of the fourth amendment" as to unannounced and forcible entry of a building, the legality of the search was governed by the standard set out in § 3109. It concluded that the circumstances confronting the agents in their effort to execute the search warrant justified noncompliance with the knock and announce requirement under both § 3109 and the fourth amendment.

By its terms § 3109 applies only to "houses." However, the courts of appeal are divided on whether it protects only dwellings. The Seventh and the Ninth Circuits have applied it to nondwellings. *United States v. Phillips*, 497 F.2d 1131, 1133–1134 (9th Cir. 1974); *United States v. Case*, 435 F.2d 766, 770 n.1 (7th Cir. 1970). Other circuits have come to the opposite conclusion. *United States v. Agrusa*, 541 F.2d 690, 700 (8th Cir. 1976), *cert. denied*, 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977); *United States v. Johns*, 466 F.2d 1364, 1365 (5th Cir. 1972); *Fields v. United States*, 355 F.2d 543 (5th Cir.), *cert. dismissed*, 384 U.S. 935, 86 S.Ct. 1452, 16 L.Ed.2d 536 (1966); *United States v. Hassell*, 336 F.2d 684, 686 (6th Cir. 1964), *cert. denied*, 380 U.S. 965, 85 S.Ct. 1111, 14 L.Ed.2d 155 (1965). *Hassell* was decided without discussion of the § 3109 issue and on alternative grounds. In view of this and the split in the circuits which has arisen since *Hassell*, we feel compelled to reexamine the issue.

The Supreme Court recognized in *Sabbath v. United States*, 391 U.S. 585, 589, 88 S.Ct. 1755, 1757, 20 L.Ed.2d 828 (1968), that § 3109 is a codification of the common law of unannounced entry. Section 3109 was

passed relatively recently, in 1958, but it was based on a provision in the Espionage Acts of 1917, 40 Stat. 229; that provision was in turn based on a New York statute which derived from the common law rule. Blakey, "The Rule of Announcement and Unlawful Entry: *Miller v. United States* and *Ker v. California*," 112 U.Pa.L.Rev. 499, 513 (1964). Thus, § 3109 is subject to the exceptions and limitations that existed at common law.

The rule against unannounced forcible entry into a dwelling has existed at common law at least since *Semayne's Case*, 5 Coke Co.Rep. 91a, in 1603. 112 U.Pa. at 500. The original rule applied only to dwellings. *Id.* at 501. Unannounced forcible entry into other structures was uniformly upheld at common law (*e. g.,* an unannounced entry into a barn was held lawful in *Penton v. Brown* in 1664), a rule that is still established beyond question in England. *Id.* Early American law permitted forcible and unannounced entry into stores, warehouses, and nondwellings so long as they were not located within the area immediately surrounding a dwelling. *Burton v. Wilkinson*, 18 Vt. 186 (1846); 112 U.Pa. at 505. Thus the history of unannounced entry at common law makes it clear that § 3109 does not prohibit the unannounced and forcible search of defendant's barbershop.

*Phillips, supra,* and *Case, supra,* do not persuade us to reach the opposite result. In *Phillips,* the Ninth Circuit found that the same policies underlying the application of § 3109 to dwellings—reducing the potential for violence, preventing physical destruction of property, and protecting the right of privacy—apply with only slightly diminished force to unannounced entries of occupied businesses. Thus, that Court felt compelled to include such businesses within § 3109's definition of a "house." Although some of the same concerns exist in both situations, there are significant differences also. As the Eighth Circuit recognized in *Agrusa,* 541 F.2d at 700, the courts have consistently afforded the home considerably more protection than other premises, based on the precept that "a man's home is his castle."

Further, it is not the place of the courts to extend a statute's application to all situations where a similar policy might be desirable.

In *Case* the Seventh Circuit relied on two decisions to support its statement that § 3109 applies to nondwellings as well as dwellings: *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) and *United States v. Mullin,* 329 F.2d 295 (4th Cir. 1964). *Silverthorne* does not even mention § 3109; it is a fourth amendment case and does not deal with an unannounced or a forcible entry. *Mullin* applied § 3109 to a nondwelling, but only after finding that the building was a part of the curtilage, so at common law was entitled to the same protection as is a house proper.

Thus, we continue to restrict the application of § 3109 to dwellings and buildings within the curtilage, the extent of the rule as it existed at common law. A barbershop is not a "house" by any definition of which we are aware.

Defendant introduced evidence that he kept a bed and television in the barbershop, and that he lived there on occasion. By this evidence he seeks to turn his barbershop into a "dwelling" so as to come within § 3109. The District Court stated that its conclusion that § 3109 was inapplicable to the search would not be changed if defendant were in fact living there, as a barbershop is still not a house. We agree. It would place an unreasonable burden on officers executing search warrants for the application of § 3109's knock and announce requirements to turn on the actual status of a building as a dwelling or a nondwelling, where to all outward indications it is a nondwelling.

In *Wong Sun v. United States,* 371 U.S. 471, 479–484, 83 S.Ct. 407, 412–415, 9 L.Ed.2d 441 (1963) the Supreme Court applied § 3109 to the entry of a laundry in which the owner and his family lived, where there were facts which would put the searching officer on notice that the building was used as a dwelling. *Wong Sun* indi-

cates that the important privacy interests protected by § 3109 require a searching officer to err on the side of caution where the facts raise a reasonable suspicion that a "business" is actually a dwelling. There were no such facts in this case. The barbershop was labeled as such and was on a block with other businesses. There is no suggestion that the DEA agents knew or had reason to know prior to entry that defendant was living there. The District Court correctly ruled that § 3109 did not control the legality of the search.

We next consider whether applicable fourth amendment principles invalidate the search of the barbershop. The Supreme Court has not ruled whether the fourth amendment requires police officers executing a search warrant to knock, announce their purpose, and be refused admittance before they may break down the door of a building to enter it. The leading case on the constitutionality of an unannounced entry is *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).[1] The four-justice plurality did not reach the question whether the Constitution forbids unannounced entry into a dwelling. It held only that because California law forbade unannounced entry, announcement became a necessary element of a reasonable search. However, the Court held that it was reason-

able on the facts before it for the officers to believe that the Kers were expecting them, and because narcotics were involved to believe that knocking would enable the Kers to destroy the evidence. Thus, their compliance with the California knock and announce rule was excused. *Id.* at 40, 83 S.Ct. at 1633. Justice Brennan authored a strong four-justice dissent in *Ker* which did reach the constitutional issue, expressing the opinion that our fundamental liberties included protection against unannounced police entry long before the adoption of the fourth amendment. Justice Brennan therefore felt that this protection is a part of the fourth amendment, and the officers' conduct was not excused on these facts. *Id.* at 47–64[2], 83 S.Ct. at 1636–1645. Justice Marshall indicated that the constitutional question was still open in *Sabbath*, 391 U.S. at 591 n.8, 88 S.Ct. at 1759, when he said that "[e]xceptions to any *possible* constitutional rule relating to announcement and entry have been recognized [by the dissent in *Ker*]," and § 3109 embodies those exceptions. (Emphasis added)

Although the Supreme Court has not addressed the issue many federal courts have, including this Circuit.[3] In some cases the discussion is dictum. In others, the opinion relies on Justice Brennan's dissent in *Ker*,

1. In *Ker*, officers investigating marijuana trafficking in California conducted a surveillance of one Murphy. They observed him engage in a transaction with a man who drove a car that was registered to Ker. They followed this man but he eluded them. Within hours and without procuring a warrant the officers proceeded to Ker's apartment where they obtained a passkey from the manager. The officers let themselves into the apartment without knocking or announcing their presence and discovered a quantity of marijuana.

2. As noted above, the common law prohibited some unannounced entries at least as early as 1603. However, the question whether this rule applied also in the case of a felony was considered still open in the English courts as late as 1819. Note, "Police Practices and the Threatened Destruction of Tangible Evidence," 84 Harvard L.Rev. 1465, 1489 (1971), citing *Launock v. Brown*, 106 Eng.Rep. 482, 483 (K.B. 1819). Thus, Justice Brennan's historical analysis may be called into question. Nonetheless, in this country the federal government (through § 3109) and virtually all of the states have a

knock and announce rule that is not limited to misdemeanors, either by statute or through decision. Ringel, *Searches & Seizures, Arrests and Confessions*, § 6.3 (1979). Thus, Justice Brennan may have been right in his ultimate point that the rule against unannounced entry of a dwelling is presently fundamental even in the case of a felony, and therefore a part of the fourth amendment.

3. *See, e. g., United States v. Valenzuela*, 596 F.2d 824 (9th Cir.) *cert. denied*, 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979); *United States v. Murrie*, 534 F.2d 695, 698 (6th Cir. 1976) (the conditions of § 3109 for forcible entry explicate fundamental purposes of the fourth amendment, and failure to observe them may be unreasonable under the amendment); *United States v. Mapp*, 476 F.2d 67, 75 (2d Cir. 1973) (*Sabbath v. United States* merged § 3109 and the fourth amendment); *United States ex rel. Ametrane v. Gable*, 401 F.2d 765 (3d Cir. 1968).

which the Supreme Court itself has never adopted. Though each case by itself is less than compelling, their conclusion has been unanimous: the fourth amendment forbids the unannounced, forcible entry of a dwelling in the absence of exigent circumstances.

■ However, in this case we are confronted with the unannounced entry of a business, not a dwelling. The fourth amendment has been held to apply to some extent to business establishments, *Mancusi v. DeForte*, 392 U.S. 364, 367, 88 S.Ct. 2120, 2123, 20 L.Ed.2d 1154 (1968); *Silverthorne Lumber Co. v. United States, supra,* although the Supreme Court has not yet delimited its full scope in the commercial context. Of the three interests served by the rule against unannounced entry—preventing violence, preventing the destruction of property, and protecting privacy—the courts have shown the most concern for protecting individual privacy. *See Sabbath, supra; Miller v. United States*, 357 U.S. 301, 313, 78 S.Ct. 1190, 1197, 2 L.Ed.2d 1332 (1967). There is much less of a privacy interest in business premises than exists in a private home. As the Court recently reiterated in *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980), "physical entry of the home is the chief evil against which the working of the fourth amendment is directed." In *United States v. Agrusa, supra*, the Eighth Circuit ruled that business premises are not entitled to the same fourth amendment protection afforded a home. In *United States v. Clayborne*, 584 F.2d 346, 350–351 (10th Cir. 1978), the court held that warrantless use of a beeper to monitor the location of a drum of chemical was permissible where the drum was located in a commercial establishment, though it would not have been had the drum been located in a residence.[4] Further, as noted above the common law in this country gave no protection against the unannounced and forcible entry of a business. Thus, any fourth amendment rule against unannounced entry that exists for private dwellings will have less force when applied to businesses.

■ Assuming some fourth amendment rule of announcement for a business, we do not need to decide the full extent of such a rule here. Even Justice Brennan's dissent in *Ker* recognized exceptions to the constitutional rule in the case of entry into a dwelling where: (1) the persons within already know of the officers' authority and purpose; (2) the officers have a justified belief that someone within is in imminent peril of bodily harm; or (3) the officers have a justified belief that those within are aware of their presence and are engaged in escape or the destruction of evidence. 374 U.S. at 47, 83 S.Ct. at 1636. The lesser privacy interest in a business implies that the exigencies required to justify an unannounced, forceful entry there are correspondingly less.

■ We come then to the facts of this case. Francis, the owner of the premises searched and thus the person with the greatest privacy and property interest at stake, knew of the DEA agents' authority for the search and intent to carry it out before the agents came to the barbershop. Thus, an announcement could not have told him much. He accompanied the agents to the entrance, but the District Court found that he did not materially aid their entry, so to a significant extent he waived his property interest. Because evidence of heroin distribution is easily destroyed it was necessary for the agents to move quickly, but because of the iron gate they consumed several minutes attempting to gain access to the shop. While they were attempting to open the iron gate the agents rang the doorbell, but received no response. They feared that evidence was being destroyed. These are extenuating circumstances. To the extent the fourth amendment protects the occupants of business premises from the potential violence of an unannounced forcible entry, no rights of defendant were implicated since he was not inside. Therefore

---

4.  *Cf. United States v. Bailey, et al.*, 628 F.2d 938 (6th Cir. 1980) (the beeper surveillance of non-contraband personal property locked in an apartment's storage area under a warrant unlimited in time violates the fourth amendment).

he may not assert the occupants' interest in support of his motion to suppress. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois, supra.* Thus, the District Court finding that the circumstances justified noncompliance with any fourth amendment knock and announce requirements that exist for a business is not erroneous. *See also Agrusa*, 541 F.2d at 696–698. The evidence from the barbershop was properly admitted at trial.

## II. Existence of Probable Cause

Defendant's next claim is that the DEA agents lacked probable cause to arrest him. He suggests that if they had probable cause for his arrest they would have secured an arrest warrant at the time they got the search warrants. He asserts that the real reason he was arrested was so the agents could use his keys to the barbershop to facilitate their entry through the iron gate. Since the arrest was not based on probable cause, several incriminating items that were seized from his person pursuant to the arrest, including a pistol and a sizeable sum of cash, should not have been admitted as evidence against him.

"The standard for arrest is probable cause, defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 (1975). Congress has specifically authorized the warrantless arrest of a narcotics suspect when probable cause to believe that he has committed a felony exists. 21 U.S.C. § 878(3).[5]

The search warrant for the barbershop was based on an affidavit signed by one of the DEA agents involved in the case. The affidavit averred that a reliable informant had within the 24 hours immediately preceding observed several ounces of a brown powdery substance that defendant represented to the informant was heroin, and that from the informant's experience appeared to be heroin. The affidavit included a partial and accurate description of the premises. The informant's reliability was supported by statements that over a four-year relationship with DEA agents the informant had repeatedly provided tips that proved to be accurate, and had never been false or misleading. After a search warrant was secured on the basis of these statements, but before it was executed, the DEA agents received another communication from the same informant to the effect that he/she had just purchased some of the brown powdery substance believed to be heroin from "Poncho Francis" at Poncho's Barbershop.

The informant's information met the two-pronged test required by *Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 1513, 12 L.Ed.2d 723 (1964). The affidavit for the warrant disclosed both the underlying basis of the informant's knowledge and established the informant's reliability. The informant's combined observations were more than sufficient to give the agents probable cause to arrest defendant, even under the strict standard by which this Circuit scrutinizes warrantless arrests. *United States v. Carriger*, 541 F.2d 545, 553 (6th Cir. 1976). Defendant's argument that even with probable cause the agents were required to get a warrant for his arrest, since they had time to do so, is without merit. *United States v. Watson*, 423 U.S. 411, 423–424, 96 S.Ct. 820, 827–828, 46 L.Ed.2d 598 (1976).

Defendant also argues that even though probable cause to arrest existed the arrest here was pretextual and illegal, since it was made in the hope of finding keys on defendant which would make it easier to execute the search warrant at the barbershop. However, this is not the type of pretextual arrest forbidden by the fourth amendment. *Carriger* and the cases cited

---

**5.** "Any officer or employee of the Drug Enforcement Administration designated by the Attorney General may ... (3) make arrests without warrant ... (b) for any felony, cognizable under the laws of the United States, if he has probable cause to believe that the person to be arrested has committed or is committing a felony; ...."

in it proscribe the use of an arrest to enable the arresting officers to search the surrounding area without first securing a warrant issued by a neutral magistrate. In sharp contrast the DEA agents in this case had a lawful right to search defendant's barbershop since they possessed a warrant authorizing the search. There is no constitutional infirmity in arresting a defendant where probable cause to make the arrest exists and the purpose of the arrest is to facilitate an otherwise lawful search. The fruits of the arrest were properly admitted at trial.

### III. Defendant's Motion to Suppress Evidence at Trial

Evidence presented during the trial caused the District Judge to doubt the correctness of his rulings on the pretrial suppression motion that defendant lacked standing to challenge the legality of the search at Klinger and that the search of the barbershop complied with the requirements of § 3109. To insure fairness he reopened the hearing with respect to the legality of the execution of both searches. Defendant sought to expand this hearing to reconsider also the question whether there was probable cause to issue the search warrants. The District Court denied defendant's attempt as untimely. Defendant urges us to find that the denial was an abuse of discretion.

Fed.R.Crim.P. 12(b) requires that a motion to suppress be made before trial. Only in a case of the most flagrant abuse will a court of appeals review a trial court's discretionary denial of a motion to suppress as untimely. *United States v. Maloney*, 402 F.2d 448, 449 (1st Cir. 1968) *cert. denied*, 394 U.S. 947, 89 S.Ct. 1283, 22 L.Ed.2d 481 (1969). Defendant fully aired the question of probable cause in the pretrial evidentiary hearing. Defendant's trial motion was grounded on the claim that the material allegations in the affidavit leading to the search warrant were false. A careful reading of the trial transcript discloses that all of the testimony that defendant relied on to challenge the affidavit relates to a buy of narcotics made *after* the search warrant was procured but before it was executed. Whether the testimony relating to this buy is true or false can have no possible bearing on the adequacy of the affidavit that led to the search warrant.

Defendant has adduced no other evidence to show that the affidavit was false, or that the information on which the search warrant was based was presented to the magistrate by the affiant with knowledge of or reckless disregard for its falsity. He thus has failed to meet the test of *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978), for quashing a search warrant before trial. The able trial judge was very careful to preserve defendant's rights. There was no abuse of discretion in reopening the suppression hearing only with respect to the legality of the execution of the search warrants.

### IV. Denial of Defendant's Motion for Mistrial

In the pretrial suppression hearing defendant challenged the admissibility of the evidence seized from Klinger on the theory that the search violated § 3109. On the basis of the evidence presented at the hearing the District Judge ruled *sua sponte* that defendant had no reasonable expectation of privacy in the house on Klinger, so lacked standing to challenge the legality of the search under *Rakas v. Illinois, supra*. Defendant did not ask for reconsideration of this ruling at any time before trial.[6]

As the Government introduced its evidence at trial, it became clear that its case depended in part on the theory that defendant had the use of one bedroom of his mother's house. In support the Government introduced several receipts addressed to defendant at Klinger along with other items seized from Klinger that allegedly belonged to defendant. Defendant made no objection to the testimony identifying the Government's exhibits until they were

---

**6.** At the suppression hearing both defendant and his mother testified that defendant did not reside at the Klinger address and had not been there for a substantial period.

all before the jury, although he had a list of proposed exhibits before trial. Defendant then objected to their admission on the ground that the evidence showed that defendant had an expectation of privacy in the bedroom on Klinger, and so had standing to challenge the search. The trial judge agreed that on the record then before him that defendant did have standing. Because he earlier found that defendant lacked standing the judge had never decided whether the warrant was executed in a lawful manner. The judge and the attorneys for defendant and the Government entered into a discussion about the proper procedure to follow. The judge suggested that he reserve a ruling on the admissibility of this evidence until the close of all proofs. Defendant's counsel not only agreed, but argued in favor of this procedure. Delaying the decision until the close of proofs enabled defendant to present to the jury the testimony of his mother and a family friend, both of whom were inside the Klinger home when the DEA agents entered. They were sympathetic witnesses whose testimony was favorable to defendant.

After the close of all of the evidence the District Judge ruled that the search warrant was improperly executed in that the agents failed to announce their purpose to the occupants of the house and that the evidence seized from Klinger was therefore not admissible. He instructed the jury to disregard that evidence. Defendant moved for a mistrial on the ground that having the evidence before the jury during the trial so prejudiced him as to deny him a fair trial. The District Judge denied the motion, pointing out that it was largely because of defendant's deliberate choice that the evidence remained before the jury.

■ Our consideration of the record convinces us that defendant's counsel made a tactical decision that defendant would be helped more than hurt by postponing a decision on the admissibility of the evidence from Klinger until after all the evidence was in. Defendant, therefore, waived any objection to the fact that the evidence remained before the jury during trial, and

cannot now predicate a motion for mistrial on any supposed prejudice that resulted. *See United States v. Sanders,* 462 F.2d 122, 124 (6th Cir. 1972).

■ Defendant also claims that he was denied the effective assistance of counsel. The only supporting evidence is that at one point in the trial the judge asked counsel to keep his temper when counsel became overzealous in his efforts to persuade the judge to reconsider his refusal to excuse the jury so a record could be made on a question that had already been asked and answered. Whether this is viewed as evidence of ineffective assistance of counsel, or more properly as a claim that the judge's attitude denied defendant the right to counsel, defendant's claim is baseless.

## V. Sufficiency of the Evidence

■ Defendant next argues that the evidence was insufficient to convince a rational jury beyond a reasonable doubt that he was guilty. In reviewing this claim we must view the evidence in the light most favorable to the Government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Craven,* 478 F.2d 1329, 1333 (6th Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed.2d 54 (1973). The evidence shows that defendant owned and operated the barbershop. A package of heroin was discovered secreted behind a wall in the public, haircutting part of the shop. More heroin plus other drugs and drug paraphernalia were found in the rear part of the shop. Other people had access to the shop, but defendant was there within an hour of when the search was performed.

Although this evidence is susceptible of more than one interpretation, it is sufficient to support the jury's verdict.

## VI. Return of the Money

Defendant moved the District Court twice before conclusion of the trial to return the money seized from the safe at Klinger. The District Judge postponed decision on this issue. Defendant and his

mother filed a third motion several months after his conviction. By this time the DEA had turned the money over to the State of Michigan pursuant to a Warrant of Levy on defendant's property for nonpayment of state taxes. Following an evidentiary hearing the District Court ruled that Mrs. Francis had not established that she was the owner of the money and so denied the motion as to her. He found that defendant was the owner of the money but ruled that since the Government no longer had possession of the money defendant's remedy was to contest the tax lien in the state courts.

Fed.R.Crim.P. 41(e) provides that

A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property on the ground that he is entitled to lawful possession of the property which was illegally seized.

The statute puts the burden on the party claiming the money to show lawful possession. At the hearing held in the District Court both defendant and his mother testified that the money belonged to her. Appellants claim here that there was no evidence to contradict Mrs. Francis' claim to the money and that the District Court was clearly erroneous in finding that she was not entitled to it.

The money was seized from a safe in a bedroom which defendant at trial urged belonged to him, for purposes of showing that he had an expectation of privacy at Klinger. In addition to the money the safe contained several receipts addressed to defendant at Klinger. At one point in the evidentiary hearing defendant testified that he kept coins and jewelry in the safe. Also seized from the bedroom were several guns and items used for the street sale of drugs which defendant testified belonged to him. Defendant's mother testified that defendant kept his money in the safe. She was unable to recite its combination although she claimed to use it regularly. An agent

testified that defendant had told him that the money belonged to defendant. This evidence tends to establish defendant's interest in the contents of the safe, and rebuts appellants' claim that no evidence indicated that the money belonged to defendant.

The District Court found that it simply could not credit Mrs. Francis' story that she owned the money. She testified that she accumulated the cash through a lifetime of saving and from rent on several properties that she owns. In support of her claim she introduced unsigned tax returns. The District Judge found the testimony of both Mrs. Francis and her son incredible. It was for him to assess the credibility of the witnesses. His finding that Mrs. Francis did not meet her burden of showing that she was entitled to possession of the money is not clearly erroneous.

Defendant asserts that since the District Court concluded that the money belonged to him it should be returned to him. The general rule is that seized property, other than contraband, should be returned to the rightful owner after the criminal proceedings have terminated. *United States v. LaFatch*, 565 F.2d 81, 83 (6th Cir. 1977), *cert. denied*, 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978).[7] The District Judge found that the money was not contraband. However, the application of the general rule to this case is complicated because the federal government no longer has physical possession of the funds but has surrendered them to the state pursuant to a tax levy.

The Government argues that its lack of possession moots defendant's claim to the money in the federal courts. We cannot agree. There still remain the questions whether the DEA lawfully turned the money over to the state, where as here the state has agreed to be bound by the federal court's decision in that regard. Contrary to the Government's argument this remains a live controversy and does not call upon the

---

7. This is true where the initial seizure was lawful and where it was unlawful. Fed.R. Crim.P. 41(e). Thus, it does not matter to the disposition of this question whether defendant in fact had standing to challenge the § 3109 violation at the entrance of his mother's house.

Court to render an advisory opinion. *Cf. DeFunis v. Odegaard*, 416 U.S. 312, 317, 319–320, 94 S.Ct. 1704, 1706, 1707, 40 L.Ed.2d 164 (1974).

A defendant's motion for return of property will be unavailing where the government has a continuing interest in the property. *United States v. Premises Known as 608 Taylor Avenue*, 584 F.2d 1297, 1303 (3d Cir. 1978). The courts have uniformly held that the Internal Revenue Service (IRS) may lawfully attach property belonging to a defendant even though the government's initial seizure of the property was illegal, and that the tax lien will frustrate a motion for return of the property. *Cancino v. United States*, 451 F.2d 1028, 1033 (U.S.Ct.Cl.1971), *cert. denied*, 408 U.S. 925, 92 S.Ct. 2504, 33 L.Ed.2d 337 (1972); *United States v. Freedman*, 444 F.2d 1387, 1388 (9th Cir.), *cert. denied*, 404 U.S. 992, 92 S.Ct. 538, 30 L.Ed.2d 544 (1971); *Field v. United States*, 263 F.2d 758, 762 (5th Cir. 1959); *Welsh v. United States*, 220 F.2d 200 (D.C.Cir.1955).[8] As the Court of Claims stated in *Cancino*, the lien cannot violate any rights that defendant has in the money because even if the money were returned to him, nothing would prevent the government from immediately levying on it at the time of its return. 451 F.2d at 1033. It makes no difference that in this case it is a state rather than the IRS which has asserted an interest in the seized cash. The State of Michigan may validly levy on money owned by defendant that is in the possession of the government.

The lien that the State of Michigan attached to defendant's cash is facially valid. It applies to "all property ... monies, credits, and bank deposits" in the possession of the Government but owed to defendant, which money the state "hereby levie[s] upon and seize[s] for satisfaction of [its tax]." There is no doubt that the language of the lien is broad enough to reach the property which the DEA in fact turned over to the state in this case. *See Welsh*, 220 F.2d at 201, 202.

Since the levy is valid the federal government was required to comply with it unless it had some greater interest in keeping the money itself.[9] No such interest is asserted.

Nor do the circumstances of the state's acquiring the money aid defendant. The evidence shows that an agent of the state found out about the cash shortly after defendant's arrest through contact with the local DEA offices. The state conducted an investigation into the possibility that defendant had an unsatisfied tax liability as a result of his drug dealings and concluded that he did. Three days after defendant's conviction the DEA was served with the Warrant of Levy.[10] The DEA transferred the money two months later, in June of 1980.

---

**8.** All of these cases upholding the validity of a federal tax levy on illegally seized property were decided before Rule 41(e) was amended in 1972. The old rule provided for return of illegally seized property "unless [it is] otherwise subject to lawful detention." As amended, Rule 41(e) provides for its return if the claimant can show "that he is entitled to lawful possession." The Advisory Committee to the 1977 amendments states that Rule 41(e) was changed so the district courts would not have to determine the legality of the seizure in cases involving contraband. The change in the quoted language was apparently incidental to the amendment. It does not affect the validity of the cases cited as precedent for the proposition that the government may levy on illegally seized property.

**9.** The District Court was concerned that the DEA turned the money over without authorization from the court or a superior. The District Court's concern did not extend to a finding that the money was improperly turned over. The judge was of the opinion that the DEA did not show a proper respect for the administration of justice in this case. This concern was in the context of general disapproval of the DEA's handling of the case.

**10.** The defendant and perhaps the District Judge attach significance to the fact that the Warrant was issued only three days after defendant's conviction. We do not appreciate the significance of this event. The state's interests and rights do not vary depending on when it served the Warrant, so long as it did so before the money was physically returned to defendant. The state could have served its Warrant of Levy on the money at any time after the DEA seized it. Whether it was by coincidence or design by the DEA agents that the state acted so soon after the guilty verdict is immaterial.

There is evidence that at some point during the criminal proceedings a DEA agent may have told defendant, in the form of a threat, that he would not get the money back. We do not approve of threats by government agents. But, assuming that the threat was made, and assuming that it was the DEA who notified the State of Michigan that it might have an interest in the money seized, this does not render invalid the otherwise lawful actions of the State of Michigan in seizing the money and of the DEA in complying with the seizure. There is no prohibition against one governmental agency providing public information to another governmental agency. There was nothing improper in the assistance by the DEA to the State of Michigan in its effort to collect taxes.

Defendant also asserts that his money was singled out by the DEA for delivery to the state, implying that he has in some sense been discriminated against. There is absolutely no evidence to support the charge that the DEA acted differently in handling defendant's money than it typically does. All of the evidence shows that the money was released in accord with a valid levy.

Defendant has not challenged the validity of the levy or the state's underlying claim for taxes in this proceeding, nor can he. The validity of the lien and of the state's tax claim must be tested by state tax law in a separate proceeding. *See Freedman, supra.* All other proceedings in this case against the defendant have now been terminated, so there is no reason of judicial economy for those questions to be answered in federal court. Having determined that the DEA did not act unlawfully in turning the money over to the state, no basis remains for the federal court's jurisdiction over any challenge to the underlying claim for taxes. Therefore, we hold that the District Court's determination that any remaining controversy is between the State of Michigan and defendant is correct.

Accordingly, the judgment of the District Court is AFFIRMED.