628 A.2d 1132

COMMONWEALTH of Pennsylvania, Appellant,

v.

William CURTIN.

COMMONWEALTH of Pennsylvania, Appellant,

v.

John CONLEY.

Superior Court of Pennsylvania.

Argued Oct. 28, 1992.

Filed June 2, 1993.

Reargument Denied Aug. 9, 1993.

Kemal A. Mericli, Asst. Dist. Atty., Pittsburgh, for Com., appellant.

Anthony M. Mariani, Pittsburgh, for Curtin, appellee.

Alisa N. Carr, Pittsburgh, for Conley, appellee.

Before McEWEN, FORD ELLIOTT and MONTGOMERY, JJ.

FORD ELLIOTT, Judge:

The Commonwealth brings this instant appeal, challenging the trial court's suppression [1] of various items of evidence all related to video gambling devices. The evidence was seized during a massive police sweep involving the execution of over

---

1. The Commonwealth has certified that their prosecution is substantially handicapped by the instant suppression as required under *Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382 (1985).

100 search warrants. We find ourselves in agreement with the suppression court and will affirm the order dated February 26, 1992.

The factual background underlying this appeal is actually quite simple. For some time now, video gambling devices have been an entertainment staple at taverns, amusement parks, and other businesses throughout the Commonwealth.

Typically, these machines feature a game of chance such as poker or blackjack, to be played against the machine, or, as have appeared of late, are simply video slot machines. The patron inserts his cash wager, receives a given amount of credits, and then bets with these credits. If lucky, the patron will accumulate credits, tallied by the machine. When a certain numerical threshold is reached, the bettor may turn in his credits with the bartender or manager and receive a cash payment. The bartender or manager then clears the credits from the machine by use of what has come to be called a "knock-off" switch. At this point, the machine is ready for use by a new customer.

Appellees were vendors operating these video gambling devices and having machines in many locations throughout Allegheny County. At the time the instant searches and seizures occurred, appellees were apparently the largest such vendor in Allegheny County.

In September of 1988, upon information that the video machines were, in fact, being operated in an illegal fashion, state and City of Pittsburgh police instituted a countywide sweep for these machines and the records pertaining to them. In preparation, search warrant applications were assembled for 102 different locations. Most of the premises were taverns, but one, located at Windgap Road and Berry Street, was a warehouse owned by appellees, and another, located at 930 Saw Mill Run Boulevard, was appellees' business offices.

On September 22, 1988, 101 applications for search warrants were presented to District Justice Anna Marie Scharding of Mt. Oliver Borough. District Justice Scharding reviewed the applications in a morning session of 54 applications and an

afternoon session of 47. Each application was approximately the same length. Although each application contained an individualized affidavit of probable cause, a substantial portion of each application was also comprised of boilerplate information. It was unclear from the testimony whether District Justice Scharding read every warrant application; however, District Justice Scharding granted each application, and the warrants were executed on the following day.

The lone warrant application which was not offered on September 22 with the 101 others was made the following morning on September 23. This application pertained to appellees' business offices located at 930 Saw Mill Run Boulevard. Unlike the 101 applications presented September 22, there is no allegation or argument presented that District Justice Scharding failed to read the September 23rd warrant application in full. Following the approval of this search warrant, the police began their countywide sweep.

Most of the warrants were for searches and seizures at businesses that were generally open to the public. Two businesses in particular were not. Those two were the object of the searches conducted at appellees' warehouse located at Windgap Road and Berry Street and at appellees' business offices located at 930 Saw Mill Run Boulevard.

The business office location was used mainly for the storage of business records and customer billing; there was no walk-in trade. Three employees generally were on duty there. The front door of the building was permanently locked and the back door was usually locked. The building was posted with signs reading, "Warning, No Trespassing, Guard dog on duty," and "Warning, No Trespassing." On the day of the countywide sweep, the rear door of 930 Saw Mill Run Boulevard was left unlocked. Police entered this building to execute their search warrant without first knocking on the door and announcing their identity.

Two issues are presented for our review, both challenging the validity of the trial court's suppression: 1) whether the review of the search warrant applications by the issuing

authority was adequate, representing an independent and detached assessment of probable cause; and 2) whether the knock and announce rule applies to commercial property.[2] We will resolve these concerns *seriatim.*

Preliminarily, we note our standard of review:

In an appeal from an order granting or denying a motion to suppress, the role of the appellate court is to determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings. In making this determination, the Court may consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as fairly read in the context of the record as a whole remains uncontradicted. When the factual findings of the suppression court are supported by the evidence, the appellate court may reverse only if there is an error in the legal conclusions drawn from those factual findings.

*Commonwealth v. DeBooth,* 379 Pa.Super. 522, 527, 550 A.2d 570, 573 (1988), *allocatur denied,* 522 Pa. 588, 561 A.2d 740 (1989). We turn now to the issues.

■ The Commonwealth first asserts that the review of the 101 search warrant applications on September 22, 1988, by District Justice Scharding was adequate to satisfy constitutional demands. We observe an earlier discussion of those demands·by our supreme court:

Both the Fourth Amendment to the United States Constitution and Article I, Section 8 of our Pennsylvania Constitution prohibit unreasonable searches and seizures. They provide that no warrant shall issue except upon probable cause supported by oath or affirmation, and that the warrant must describe the place to be searched and the person or things to be seized. This constitutional protection

2.  Although this appears to be a matter of first impression, we note that in *Commonwealth v. Perry,* 254 Pa.Super. 549, 386 A.2d 86 (1978), a panel of this court resolved a controversy involving the search of commercial premises. It is clear from that opinion that the court assumed that knock and announce applied equally to commercial property.

against unreasonable searches and seizures is not some new thing produced by recent decisions in the courts. It is rooted in long recognized principles of humanity and civil liberty. *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921); *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

In order to insure the protection of those constitutional provisions both this Court and the United States Supreme Court require law enforcement officers to obtain a judicially issued search warrant absent certain exigent circumstances. *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *Commonwealth v. Silo*, 480 Pa. 15, 389 A.2d 62 (1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1053, 59 L.Ed.2d 94 (1979); *Commonwealth v. Linde*, 448 Pa. 230, 293 A.2d 62, *cert. dismissed*, 409 U.S. 1031, 93 S.Ct. 523, 34 L.Ed.2d 482 (1972); *Commonwealth v. Cockfield*, 431 Pa. 639, 246 A.2d 381 (1968); *Commonwealth v. Ellsworth*, 421 Pa. 169, 218 A.2d 249 (1966).

.    .    .    .    .

The magistrate's function is more than the ministerial one of administering an oath to an officer who has set forth facts the officer believes constitute probable cause. The magistrate must make a judicial determination, albeit a nontechnical, common sense judgment, *see Gates*, as to whether probable cause exists. It is not enough for a policeman to present an affidavit to the magistrate prior to the search which affidavit the judiciary may consider on the issue of probable cause with complete hindsight after the police have completed their search. The magistrate must actually make a finding of probable cause to validate the warrant before he issues it.

*Commonwealth v. Chandler*, 505 Pa. 113, 124, 477 A.2d 851, 855–856 (1984). *See also Commonwealth v. Peticca*, 401 Pa.Super. 553, 585 A.2d 1065 (1991), *allocatur denied*, 528 Pa. 629, 598 A.2d 282 (1991).

The problem with the magistrate's review of the warrant applications instantly is two-fold. First, by the magistrate's own admission she did not read every page of every search warrant application. She maintained that she read the entire application only with regard to the first application. Thereafter, she claims to have read the individualized portions of each application but did not re-read the boilerplate sections, only glancing at those segments in order to determine that they were, indeed, identical.

Our second problem with the review of the warrant applications pertains to conflicting testimony. The suppression hearing below was handled in two sessions, one held February 22, 1991, and the other May 6, 1991. District Justice Scharding testified on both dates. Unfortunately for our determinations, the magistrate's account conflicted between the two occasions. On February 22, District Justice Scharding's testimony indicated that she may have failed to review the 101 warrant applications adequately. Her testimony was unclear and indicated either that she may not have ascertained that the boilerplate was identical in all of the applications or that she may not have read even the individualized parts of the applications:

[DEFENSE COUNSEL:]

Clearly you didn't read any of them; isn't that true?

[DISTRICT JUSTICE SCHARDING:]

I read the originals.

[DEFENSE COUNSEL:]

You read the original?

[DISTRICT JUSTICE SCHARDING:]

Yes.

[DEFENSE COUNSEL:]

One original?

[DISTRICT JUSTICE SCHARDING:]

The original—the affidavit I believe is the same on most of them. I read the original before I signed it.

[DEFENSE COUNSEL:]

You read one of them—like one of them, and then for 53 of them you just signed; is that correct?

[DISTRICT JUSTICE SCHARDING:]

Yes.

[DEFENSE COUNSEL:]

Assuming that the other 53 were the same as the one that you read; is that correct?

[DISTRICT JUSTICE SCHARDING:]

That's correct.

[DEFENSE COUNSEL:]

Okay. You are not sure which one that one was?

[DISTRICT JUSTICE SCHARDING:]

I read the first page of each affidavit, not all the copies.

[DEFENSE COUNSEL:]

The first page of each affidavit—

[DISTRICT JUSTICE SCHARDING:]

The original of each affidavit, not all the copies of the affidavits.

[DEFENSE COUNSEL:]

Well, you indicated to me that you read one of the affidavits, and the affidavits were all the same?

[DISTRICT JUSTICE SCHARDING:]

No.

[DEFENSE COUNSEL:]

That's what you said. Now, that's what you just testified—

[DISTRICT ATTORNEY:]

I object. That's not—

[DISTRICT JUSTICE SCHARDING:]

I read the original affidavit on each search warrant, scanned over it to make sure that it was the same wording as the original that I had read.

[DEFENSE COUNSEL:]

Magistrate, that's not what I understood you just to say.

[DISTRICT JUSTICE SCHARDING:]

But I did not read each individual copy because there are—

[DEFENSE COUNSEL:]

We have 54 here.

[DISTRICT JUSTICE SCHARDING:]

Yes.

[DEFENSE COUNSEL:]

Okay. It would be over 550 pages. It would be physically impossible for you to read this within two or three hours it seems to me. Would you agree?

[DISTRICT JUSTICE SCHARDING:]

I read the original affidavit—

[DEFENSE COUNSEL:]

Now, would you agree with my question? Would you agree with what I've just said to you, Magistrate Scharding?

[DISTRICT JUSTICE SCHARDING:]

Yes.

[DEFENSE COUNSEL:]

Physically impossible. So clearly you could not and did not read—

[DISTRICT JUSTICE SCHARDING:]

Not every copy.

[DEFENSE COUNSEL:]

—all of these correct?

[DISTRICT JUSTICE SCHARDING:]

Right.

[DEFENSE COUNSEL:]

Okay. Now, what I understood you to say was that you read one of them?

[DISTRICT JUSTICE SCHARDING:]

Right.

[DEFENSE COUNSEL:]

All the way through?

[DISTRICT JUSTICE SCHARDING:]

Yes.

[DEFENSE COUNSEL:]

Is that correct?

[DISTRICT JUSTICE SCHARDING:]

Yes.

[DEFENSE COUNSEL:]

Okay.   One of the 54?

[DISTRICT JUSTICE SCHARDING:]

Yes.

[DEFENSE COUNSEL:]

All right.   And then you assumed that the other 53 were the same?

[DISTRICT JUSTICE SCHARDING:]

Yes.

[DEFENSE COUNSEL:]

Is that correct?

[DISTRICT JUSTICE SCHARDING:]

Right.   This is what I—

[DEFENSE COUNSEL:]

Okay.   And therefore, you did not have to read any of these 53, just sign them;  correct?

[DISTRICT JUSTICE SCHARDING:]

Correct.

[DEFENSE COUNSEL:]

And that's what you did?

[DISTRICT JUSTICE SCHARDING:]

Yes.

Notes of testimony, 2/22/91 at 52–55.

■ To fulfill her obligation to make an assessment of probable cause, a magistrate must actually make herself aware of the entire contents of a search warrant application. Obtaining such actual awareness will not always entail reading

a warrant application word for word in its entirety. The instant case is an excellent example of such. We believe it would have been wholly proper for District Justice Scharding to have read one application in its entirety and to have reviewed the remaining applications by reading the individualized portions and scanning the boilerplate sections to ascertain that they were, in fact, identical boilerplate. That is the method that the magistrate followed according to her testimony at the second suppression hearing on May 6, 1991. This method of review would have been found acceptable by this court. To the extent that the opinion of the suppression court indicates that every warrant application would have to be read word for word, cover to cover, it is in error.[3]

However, because of the testimony adduced at the first suppression hearing, we are unable to conclude that District Justice Scharding followed an acceptable method of review. Her testimony on that occasion suggests that she did not at least briefly review the boilerplate of each application. Moreover, the testimony implies that she may also have not read some of the individualized parts of each application. In either case, such a method of review would be inadequate to meet constitutional requirements.

While we are not in full agreement with the suppression court's rationale, we cannot say that its ultimate legal conclusion was erroneous. The suppression court clearly found that District Justice Scharding did not read every affidavit of probable cause.[4] These affidavits constituted a vital part of the individualized sections of the warrant applications. Having failed to review each affidavit of probable cause, District Justice Scharding could not have made a determination of probable cause. The fruits of these searches must be suppressed and the court below properly did so. We will affirm

3. "Since *the magistrate did not read every page of every warrant,* nor did she read every affidavit of probable cause of every warrant, the warrants must be held to be invalid." Suppression court opinion, 3/2/92 at 7 (emphasis added).

4. Suppression court opinion at 7. Having support in the record for such finding, our standard of review requires us to accept it.

the court below as to the suppression of evidence gathered pursuant to the 101 warrants issued on September 22.

■ The second issue presented is whether Pennsylvania's "knock and announce" rule is applicable to commercial structures. This rule is found among our Rules of Criminal Procedure:

### RULE 2007. MANNER OF ENTRY INTO PREMISES

(a) A law enforcement officer executing a search warrant shall, before entry, give, or make reasonable effort to give, notice of his identify, authority and purpose to any occupant of the premises specified in the warrant, unless exigent circumstances require his immediate forcible entry.

(b) Such officer shall await a response for a reasonable period of time after his announcement of identity, authority and purpose, unless exigent circumstances require his immediate forcible entry.

(c) If the officer is not admitted after such reasonable period, he may forcibly enter the premises and may use as much physical force to effect entry therein as is necessary to execute the search.

Pa.R.Crim.P. 2007. 42 Pa.C.S.A.

The knock and announce rule is derived from English common law:

The 'knock and announce' rule's origins predate the United States Constitution. It was born in English Common Law and was subsequently adopted in America. In recent times, the 'knock and announce' rule has assumed a Constitutional dimension. Both our Court and United States Supreme Court have held that the Fourth Amendment's prohibition against unreasonable searches and seizures applies to the manner of a warrant's execution. *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Commonwealth v. Newman,* 429 Pa. 441, 240 A.2d 795 (1968). Even a valid warrant may not be executed in an unreasonable manner; unreasonableness is determined on a case-by-case

basis. *Id.* The rule's primary purpose is to prevent resistance to lawful authority based on the occupant's efforts to protect his privacy expectation against unauthorized entry of persons unknown to him. It gives the individual a chance to surrender the premises peacefully in the face of lawful authority. *Commonwealth v. Beard,* 501 Pa. 385, 461 A.2d 790 (1983); *Commonwealth v. Norris,* 498 Pa. 308, 446 A.2d 246 (1982); *Commonwealth v. DeMichel,* 442 Pa. 553, 277 A.2d 159 (1971) (plurality opinion).

*Commonwealth v. McDonnell,* 512 Pa. 172, 176–77, 516 A.2d 329, 331 (1986).

The Commonwealth would argue that knock and announce has no application to commercial property. Relying on the common law origins of the rule, the Commonwealth posits that at common law, the rule's primary purpose was to prevent the needless destruction of a person's dwelling. *Citing Semayne's Case,* 77 Eng.Rep. 194 (K.B.1603), and *Lee v. Gansel,* 98 Eng.Rep. 935 (K.B.1774), for the proposition that the law abhors the breaking and destruction of a place of habitation and safety without some default on the part of the owner, the Commonwealth contends this same rationale cannot apply to commercial property.

Further, the Commonwealth refers us to federal statutory and decisional law for additional support for this proposition. The knock and announce rule has been codified in the federal statutes:

**§ 3109. Breaking doors or windows for entry or exit**

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109.

As noted by the Commonwealth, some federal cases have interpreted the use of the word "house" in the statute to limit the application of the rule to dwellings. However, our research reveals a division of authority on this issue among the

federal circuits. In any event, the case relied upon by the Commonwealth presents an interesting analysis. In *United States v. Francis,* 646 F.2d 251 (6th Cir.1981), *cert. denied, Francis v. United States,* 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981), DEA agents secured a warrant to search a barbershop owned by Francis. The factual context in which the warrant was executed must be recounted before the court's analysis can be addressed:

After the warrants were issued but before they were executed the agents, through further contact with the informant, learned that he/she had very recently purchased heroin from defendant at the shop. The agents concluded that this new information coupled with the informant's earlier observations gave them probable cause to arrest defendant before searching his shop. They placed the barbershop under surveillance on the evening of September 29. When defendant exited the agents followed and arrested him. They took him to a nearby parking lot where they searched him and interrogated him concerning drug activities. The search of defendant turned up two large rings of keys which included keys to the shop. The agents informed defendant when they arrested him that they had a search warrant for the barbershop.

The agents returned to the barbershop, both entrances of which were protected by an outer iron gate and an inner wooden door. They struggled with the keys for about five minutes in the presence of defendant before they successfully opened the iron gate at the front entrance. The District Court found that defendant gave them no assistance in effecting entry. The DEA agents had knowledge that some persons remained inside. Fearing that evidence of heroin trafficking was being destroyed, they did not further delay to find the key to the wooden inner door, but instead forced the door with a battering ram. At no time did they announce their purpose to the occupants or request their permission to enter.

*United States v. Francis,* 646 F.2d at 254.

On appeal, Francis challenged the search of the barbershop under both § 3109 and the Fourth Amendment. The Sixth

Circuit Court of Appeals held that § 3109 applied only to dwellings; a barbershop, by its outward appearance, was not a place where one lived. However, the court noted a split in the circuits on this issue. In a separate analysis, the court then addressed whether the failure to knock and announce before entry by the police was a violation of defendant's Fourth Amendment rights. The court stated that "the fourth amendment forbids the unannounced, forcible entry of a dwelling in the absence of exigent circumstances," *Francis,* 646 F.2d at 258. The court went on to opine that because the *Francis* search involved a commercial establishment, and not a dwelling, that there was a diminished privacy interest to be protected. However, the court then declined to find that under the Fourth Amendment, knock and announce did not apply to commercial structures. Rather, the court decided that the officer's actions could be upheld under one of the exceptions to the constitutional "knock and announce" rule.

The Ninth Circuit has had occasion to address this same issue and has found that "knock and announce" applies to a commercial establishment under § 3109. *United States v. Phillips,* 497 F.2d 1131 (9th Cir.1974). However, in *United States v. Little,* 753 F.2d 1420 (9th Cir.1984), the court upheld the execution of an arrest warrant[5] by IRS agents who entered a business reception area through an unlocked door during business hours without knocking and announcing their identity. The defendant was found and arrested in the reception area. The court opined:

A reception area is used for purposes of greeting and screening those who enter an office to determine if the individual is properly there. Also, office workers are generally free to walk through this area. Since the public and office workers are allowed to walk freely into a reception area, an individual working in the office can have no reasonable expectation of privacy there. Accordingly, section 3109 does not apply to Indec's reception area.

5. Section 3109 applies to the execution of both search and arrest warrants. *See Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

Appellants cite *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); and *United States v. Phillips*, 497 F.2d 1131 (9th Cir.1974), in support of their claim that § 3109 should apply to this situation. Appellants' reliance on these cases is misplaced. Neither *Wong Sun* nor *Lo–Ji Sales, Inc.*, involved § 3109. The issue before the court in *Wong Sun* was whether the police had probable cause to arrest the defendants. In *Lo–Ji Sales, Inc.*, the Supreme Court did not address the propriety of the police officer's entry into an adult bookstore during business hours to effectuate a search warrant. The issue in *Lo–Ji* was the sufficiency of an affidavit and search warrant to seize certain items once the officers were on the business premises.

*United States v. Phillips*, is factually distinguishable. *Phillips* involved a nocturnal entry into a locked, occupied business. In concluding that § 3109 applied to such an entry, this court emphasized that 'a locked commercial establishment, at least at night, is a "house" as that word is used in § 3109.' 497 F.2d at 1133–34.

*United States v. Little*, 753 F.2d at 1436.

It is important to note that the court did not apply a diminished privacy interest to the reception area. Rather, the court found *no* expectation of privacy in those areas of commercial establishments which are open to the public. We find the analysis of the Ninth Circuit to be cogent.

In Pennsylvania, the "knock and announce" rule has been repeatedly recognized as having a constitutional predicate to prevent unreasonable searches and seizures. *Commonwealth v. Means*, 531 Pa. 504, 614 A.2d 220 (1992); *Commonwealth v. McDonnell, supra; Commonwealth v. Chambers*, 528 Pa. 403, 598 A.2d 539 (1991); *Commonwealth v. Morgan*, 517 Pa. 93, 534 A.2d 1054 (1988). Echoing the language of *McDonnell, supra*, "Both our Court and United States Supreme Court have held that the Fourth Amendment's prohibition against unreasonable searches and seizures applies to the manner of a warrant's execution.... Even a valid warrant may not be

executed in an unreasonable manner; unreasonableness is determined on a case-by-case basis." *McDonnell,* 516 A.2d at 331. No Pennsylvania case has drawn a distinction as to the applicability of knock and announce in a residential setting versus a commercial setting.[6] Nor do we find a basis for such a distinction. In arriving at this conclusion, we return to the rationale underlying the knock and announce rule:

'The, purpose[s] of the "knock and announce" rule,' as articulated by this court in *Commonwealth v. Morgan, supra,* '[are] to prevent violence and physical injury to the police and occupants, to protect an occupant's privacy expectation against unauthorized entry of persons unknown to him or her, and to prevent property damage resulting from forced entry.' *Morgan,* 517 Pa. at 97, 534 A.2d at 1056. *Commonwealth v. Parsons,* 391 Pa.Super. 273, 278–79, 570 A.2d 1328, 1331 (1990).

Viewed in the light of these three-fold interests, the knock and announce requirement of Rule 2007 would apply equally to residential and commercial property alike. Moreover, the distinction which we see as critical, as did the Ninth Circuit, is whether the commercial property in question is open to the public.

First, in regard to the prevention of violence or injury either to occupants or police, we believe that the knock and announce rule is as important in a commercial setting as in a private residence. Just as a homeowner would seek to protect a home and family from unannounced intruders, it is not unlikely that a business proprietor might respond to a violent entry in kind. Businessmen, far more often than homeowners, are the targets of armed robbery. Very often the value of chattels and cash on hand located on commercial property exceeds that which ordinarily would be found in a home. These factors coupled with the non-presence of young children might actually heighten the possibility that businessmen would maintain (and use) firearms on commercial premis-

6. Again, we note that in *Commonwealth v. Perry, supra,* the court assumed that knock and announce applied to commercial property. See footnote 2.

es. Some business enterprises employ armed security guards to prevent just such intrusions. Of course, the danger of violence and injury mainly arises where the commercial property is closed to the general public. Where police enter an area of commercial premises that are open to the general public, they could not be mistaken for unauthorized intruders.

Second, in a situation such as that presented instantly, where appellees have sought to secure their business property from entry by the general public, we think that conduct fairly well announces to the world that they expect whatever is contained therein will be free from outside examination or interference. In other words, by bolting the doors at 930 Saw Mill Run Boulevard, appellees created an expectation of privacy. Under such circumstances, the knock and announce rule protects the selfsame privacy interests that are present where police seek to invade a person's home pursuant to a warrant. As such, those privacy interests are just as deserving of accommodation by the police.[7]

The third interest which the knock and announce rule attempts to serve, is the protection of property from damage attendant to forced entry. Of course, this interest would exist equally regardless of whether the property is residential or commercial in nature and restricted from general public entry.

We also believe that where commercial premises are open to the public, the interests served by the knock and announce rule are largely nonexistent. First, there is no danger of a violent response where there is no need to force an entry. Second, there can be no expectation of privacy in any area where any member of the public might venture. Third, if there is no need to force an entry, there is no likelihood of property damage.

Further, we see little reason for imposing greater strictures upon the execution of searches of certain edifices merely because they are also employed as dwellings. Many ongoing criminal enterprises employ dwellings as bases of operation.

7. We likewise do not think that the presence of employees somehow vitiates the expectation of privacy any more than the presence of invited guests would vitiate the expectation of privacy in the home.

It can hardly be denied that a "crack house" is a commercial establishment. Nor can a bookmaking parlor operated in the home be viewed otherwise. Why should our law afford such an enterprise greater comity in the execution of warrants than it affords more outwardly commercial undertakings simply because the criminals operate from a place of residence? Moreover, can it seriously be advocated that a commercial warehouse has a lessened privacy interest where signs are posted to warn against trespassers and doors are kept locked or bolted so as to prohibit uninvited entry?

Rather, we find that unannounced entry is equally repugnant to constitutional safeguards regardless of whether the entry occurs in private residential or private commercial property. If commercial property is open to the public, there can be no privacy interest subject to protection upon entry. An officer executing a search warrant may enter onto the premises with the same license as any member of the public. Therefore, we hold that the knock and announce provisions of Rule 2007 apply equally to residential and commercial property alike, where the commercial property is not open to the general public.

Violation of Rule 2007 has been held to require application of the exclusionary rule to the seized evidence where fundamental constitutional concerns are implicated. *Commonwealth v. Chambers, supra.* We believe such concerns are implicated here.[8]

We have found no merit in either contention raised by the Commonwealth. The mass review of the search warrant

---

8. We are aware that there are four instances where a failure to knock and announce is excused:

    1. the occupants of the premises remain silent after repeated knocking and identification;

    2. the police are virtually certain that the occupants of the premises already know their purpose;

    3. the police have reason to believe that an announcement prior to entry would imperil their safety; and

    4. the police have reason to believe that evidence is about to be destroyed.

*Chambers* at 408–09, 598 A.2d at 541. However, the Commonwealth does not argue that any of these exceptions are applicable instantly.

applications by District Justice Scharding was inadequate. Moreover, with regard to the sole valid warrant, the police failed to conduct the search pursuant to mandated knock and announce procedure.[9]

Accordingly, the order of the trial court dated February 26, 1992, is hereby affirmed. Jurisdiction relinquished.

---

**9.** We believe that the evidence seized at the Windgap Road/Berry Street property might also be subject to suppression for failure of the police to knock and announce. However, we need not reach this determination as we have already found that evidence properly suppressed under the first issue presented herein.